Victoriano Tomboc **ARADANAS**, Plaintiff,

v.

William A. **HOGAN, District Director, Immigration and Naturalization Service, Honolulu, Territory of Hawaii, Defendant.**

Civ. No. 1529.

United States District Court
D. Hawaii.

Oct. 11, 1957.

Findings of Fact and Conclusions
of Law Oct. 29, 1957.

Howard K. Hoddick, Honolulu, Hawaii, for plaintiff.

Louis B. Blissard, U. S. Atty., District of Hawaii, Honolulu, Hawaii, by Charles B. Dwight, III, Asst. U. S. Atty., District of Hawaii, Honolulu, Hawaii, for defendant.

McLAUGHLIN, Chief Judge.

As noted during the course of argument and as conceded by the Immigration authorities, this case does present some appealing features. Not only has this man lived in this part of the United States known as Hawaii for most of the years of his life, having come here, I believe, when he was nineteen years of age, but he came to this country originally as a national of the country. He was later by virtue of this country giving independence to the Philippines transformed from a national to an alien.[1] Another phase of the fact picture here which tends to evoke favorable reaction, if that be possible in point of law, is the fact that after World War II, Kwajalein Island being under the dominion of the United States Navy and it desiring to have certain work there done and to that end employed a contractor known as the Contractors Mid-Pac, that contractor solicited labor here in the islands to go to Kwajalein, and this man responded, offering his services under contract as a carpenter, and he was taken there at government expense aboard Navy transportation. When he got there the American flag was flying and whatever law and order appeared to be on the island was in Navy garb, and in a large sense, with the American flag flying, he seemed to be quite at home, as much as he had been in Hawaii as an alien admitted for permanent residence subsequent to the independence of the Philippines. By that I mean that was the status he acquired when the Philippines was given its independence. Then, too, when he decided to cease working for the Navy, although at his own expense, he came back to Hawaii, U. S. A., aboard Navy transporta-

1. Cabebe v. Acheson, 9 Cir., 1950, 183 F. 2d 795.

tion. Indeed, things were of such a nature that even if this man had been a citizen of the United States, it is doubtful if he or anyone else without Navy permission could have gone to or remained on Kwajalein Island.

However, the question for decision is whether or not in point of law in terms of the Immigration Act then applicable in 1951, to-wit, the 1917 Act, whether this alien when he left for Kwajalein under contract left the United States, as that term is defined in the 1917 Act, and did so intentionally and voluntarily, so that when he returned, his return and admission may be deemed a re-entry. If it be a re-entry, then the order of deportation for cause made to appear on this record is justified in point of law; but if his return from Kwajalein was not a re-entry within the meaning of the Immigration Act then in force, the authorities have no right to deport this man.

This case, of course, must be distinguished from a naturalization case. It must be distinguished from cases where the departure was involuntary or unintentional, or to be more exact, where the touching of a foreign port or place beyond the jurisdiction of the United States was unintentional and involuntary. I have in mind in saying this the cases of the shipwrecked seaman [2] and of the man going by train from one part of the United States to another through Canada.[3] And, too, this case must be distinguished from problems which have arisen with respect to other areas of the Pacific over which the United States has a different kind of control or to which it has a different relationship, such as Wake or Guam or Okinawa and others that might be mentioned, for this case involves an area known as Kwajalein Island which is presently an area within the Trust Territory under the United Na-

tions, and the relationship of our country to this particular territory is one of an administrating authority under the United Nations Charter.

The question is, under the 1917 Act, whether or not with respect to Kwajalein in 1951 it comes within the definition of the United States, any waters, territory or other place subject to the jurisdiction thereof. Despite the control of this area by the Navy for the United States as the administering authority under the trusteeship of the United Nations, despite the fact that the American flag and American law there obtains, I do not believe that in point of law for immigration purposes that Kwajalein is within the definition of the United States as used in the 1917 Act.[4] Quite clearly it is not within the definition of the United States as that term is defined in the 1952 Act, 8 U.S.C.A. § 1101(a) (38) and which point has already been decided by this Court, at least for the purposes of naturalization, by Judge Wiig in the Reyes case found in 140 F.Supp. 130.[5] And it is said, and I believe for this proposition the Chief Justice of the United States is quoted in the Gonzales case,[6] that the 1952 Act is but a codification of the pre-existing law relating to entry. If it is, of course, clearly my ruling is doubly sound. But, in any event, if the 1952 Act is different than prior law, I am still, nevertheless, satisfied that under the 1917 Act Kwajalein was not within the meaning of the word "United States," as defined by that Act. Indeed, our country's relationship to Kwajalein is wholly at variance with the jurisdictional concept expressed, in the 1917 Act, for despite the broad powers given to our country with respect to Kwajalein by the United Nations Charter, it is still something different and apart from the jurisdiction which this nation exercises as of inde-

2. Delgadillo v. Carmichael, 1947, 332 U.S. 388, 68 S.Ct. 10, 92 L.Ed. 17.

3. Carmichael v. Delaney, 9 Cir., 1948, 170 F.2d 239.

4. Former 8 C.F.R. 176.101(b) and former 22 C.F.R. 42.101(b) effective May 11, 1949 (14 F.R. 2435, 2437).

5. In Application of Reyes, D.C.1956, 140 F.Supp. 130.

6. Barber v. Gonzales, 1954, 347 U.S. 637, 74 S.Ct. 822, 98 L.Ed. 1009.

548

pendent right over its own lands, people and waters.

So it is that I hold that when this man who voluntarily and intentionally went to Kwajalein, which is outside of the United States, that when he returned, he made a re-entry, thus giving to the Immigration authorities a legal foundation upon which to cause to order his deportation. Accordingly, the complaint is dismissed, for it is the holding of the Court that this plaintiff is deportable.

### Findings of Fact

#### I

Plaintiff, Victoriano Tomboc Aradanas, is a native and citizen of the Republic of the Philippines.

#### II

Plaintiff entered the United States at Honolulu on December 15, 1924, as a national of the United States.

#### III

Plaintiff has resided continuously in the Territory of Hawaii since December 15, 1924, except for a trip to Kwajalein Island, Trust Territory of the Pacific, beginning in May 1951. He reentered the Territory of Hawaii on November 7, 1951.

#### IV

Plaintiff was convicted of the crime of counterfeiting in 1934.

#### V

On May 27, 1955 a Special Inquiry Officer of the U. S. Immigration Service entered an order for the deportation of the plaintiff on the ground that at the time of entry he was within one or more of the classes of aliens excludable by the law existing at the time of such entry, to wit, a person who has been convicted of a felony or other crime or misdemeanor involving moral turpitude prior to entry into the United States, under Section 3 of the Act of February 5, 1917,* to wit, counterfeiting.

#### VI

A motion to reopen the hearing was denied by the Special Inquiry Officer on September 23, 1955. On appeal the Board of Immigration Appeals sustained the Special Inquiry Officer on deportability but remanded the case for consideration of discretionary relief.

#### VII

The plaintiff was considered for discretionary relief but found by the Special Inquiry Officer not to be a person of good moral character and therefore not eligible for discretionary relief. This decision was appealed and the appeal dismissed by the Board of Immigration Appeals.

#### VIII

In each of the hearings the Special Inquiry Officer's findings were based on reasonable, substantial, and probative evidence.

#### IX

The Special Inquiry Officer's finding that plaintiff made an entry upon his arrival from Kwajalein at Honolulu is based on reasonable, substantial, and probative evidence.

#### X

Plaintiff is an unscreened alien not admitted for permanent residence to the continental United States.

#### XI

Kwajalein Island is a part of the Trust Territory of the Pacific.

#### XII

The Trust Territory of the Pacific is under the control of the United Nations and administered for that organization by the United States under a Trusteeship Agreement.

### Conclusions of Law

#### I

This Court has jurisdiction over this claim for relief under the provisions of Section 10, Administrative Procedures Act, 5 U.S.C.A. § 1009, and 28 U.S.C. § 2201.

* Now 8 U.S.C.A. § 1182.

## II

The plaintiff is an alien and under facts presented is presumed to have been lawfully admitted for permanent residence.

## III

The crime of counterfeiting is a crime involving moral turpitude.

## IV

The Trust Territory of the Pacific Islands is administered by the United States under the Trusteeship Council of the United Nations. The Trusteeship Council is one of the principal organs of the United Nations, established in 1946, for the purpose of carrying out the provisions of the Charter of the United Nations relating to the creation and administration of an international trusteeship system. As described in the Charter, the function of the international trusteeship system is to safeguard the interests of the inhabitants of territories which are not yet self-governing; such areas are classified as "trust territories" and include territories formerly held under mandate, territories detached from any of the Axis Powers as a consequence of World War II, and territories voluntarily placed under the system by nations responsible for their administration. The Charter vests the General Assembly with authority to exercise the functions of the United Nations relating to the administration of all trust territories except those classified as "strategic areas"; the administration of the strategic areas is a responsibility of the Security Council. The Trusteeship Council operates under the general authority of the General Assembly, and is empowered to assist the General Assembly and the Security Council in the exercise of these functions.

Three categories of members of the United Nations are included in the composition of the Trusteeship Council; members administering trust territories; permanent members of the Security Council not administering trust territories; and as many other members elected for a three-year term by the General Assembly as will ensure that the membership of the Council is equally divided between members which administer trust territories and members which do not. Each member of the Council has one vote, and decisions are made by a majority of the members present and voting. The specific powers of the Council may be listed as follows: It may consider reports submitted by nations administering trust territories; these nations are termed "administering authorities". In consultation with the administering authorities, it may examine petitions submitted by the inhabitants of trust territories. The Council may arrange periodic visits to trust territories at times agreed upon with the administering authority. It may formulate a questionnaire on the political, economic, social, and educational advancement of the inhabitants of each trust territory; the administering authorities are required to use these questionnaires as the basis of annual reports to the General Assembly on the status of all trust territories except those classified as strategic areas.

When the Trusteeship Council was established the Pacific Islands formerly under Japanese mandate were placed under its jurisdiction.

## V

Section 1, Immigration Act of 1917 (39 Stat. 874), as amended,† is a portion of the law applicable to this case.

## VI

Kwajalein is foreign for immigration purposes, and for all purposes is primarily under the sovereignty and jurisdiction of the United Nations.

## VII

The "word of art" meaning of entry was satisfied when the plaintiff came to Honolulu by plane from Kwajalein, Trust Territory of the Pacific.

## VIII

Assuming temporarily that Kwajalein is under the jurisdiction of the United

† Now 8 U.S.C.A. § 1101.

States, then the plaintiff must contend with the provisions of Section 1, Immigration Act of 1917.

### IX

Under Section 1, Immigration Act of 1917, plaintiff made an entry even if Kwajalein is considered to be under the jurisdiction of the United States.

### X

Plaintiff is a deportable alien ordered deported, not entitled to administrative relief. The order of deportation is according to law.

Let judgment in favor of the defendant and against the plaintiff be entered herein.