The **PEOPLE OF SAIPAN**, By and Through Herman O. **GUERRERO** et al., Plaintiffs,

v.

**UNITED STATES DEPARTMENT OF INTERIOR** et al., Governmental Defendants,

and

Continental Airlines, Inc., a Nevada corporation, Corporate Defendant.

Civ. No. 72–3720.

United States District Court,
D. Hawaii.

March 20, 1973.

Edward C. King, James E. Duggan, Daniel H. MacMeekin, Sionag H. Mac-Meekin, Moen, Truk, Eastern Caroline Islands, Samuel Withers, III, Micro-

nesian Legal Services Corp., Saipan, Mariana Islands, for plaintiffs; Boyce R. Brown, Jr., Mattoch, Edmunds, Kemper & Brown, Honolulu, Hawaii, of counsel.

Jon T. Miho, Asst. U. S. Atty., Robert K. Fukuda, U. S. Atty., Honolulu, Hawaii, for Governmental defendants.

Carlos H. Salii, Asst. Atty. Gen., Trust Territory of the Pacific Islands, Saipan, Mariana Islands, for defendant Johnston.

Katsuro Miho, John D. McComish, Honolulu, Hawaii, for corporate defendant.

## ORDER GRANTING MOTIONS TO DISMISS

SAMUEL P. KING, District Judge.

This case involves the application of the National Environmental Policy Act (hereinafter "NEPA"), 42 U.S.C. § 4321 et seq. (Supp.1973), to the official actions of the High Commissioner of the Trust Territory of the Pacific Islands (hereinafter "Trust Territory").[1] Defendants have moved to dismiss the Complaint on a variety of procedural and substantive grounds. These grounds raise the issues now before the court.

Plaintiffs, citizens of the Trust Territory who are residents of Saipan, Mariana Islands, allege that the action of the High Commissioner in approving and later executing a lease agreement with Continental Airlines, Inc. (hereinafter "Continental") to construct and operate a hotel on public land adjacent to Micro Beach, Saipan, unlawfully by-

passes NEPA because no environmental impact statement was prepared or considered prior to approval of the lease, and is "an abuse of discretion" within the meaning of the judicial review provisions of the Administrative Procedure Act (hereinafter "APA"), 5 U.S.C. §§ 701–706, because the environmental implications of the project were not given bona fide consideration. It is further alleged that the High Commissioner has an affirmative fiduciary duty to comply with NEPA under the provisions of the Trusteeship Agreement for the Former Japanese Mandated Islands.[2] An injunction is sought prohibiting the implementation of the lease agreement until the environmental impact of the hotel has been studied and evaluated.

In addition to the immediate parties to the lease (Continental and the High Commissioner), plaintiffs have joined as defendants the Department of the Interior, Secretary of the Interior Rogers C. B. Morton and Deputy Assistant Secretary of the Interior for Territorial Affairs Stanley S. Carpenter. As discussed *infra* at 653, plaintiffs assert that the Department of the Interior has responsibility for the civil administration of the Trust Territory and that the High Commissioner acts as an agent of the Department in his role as chief executive of the Trust Territory Government.

On January 10, 1973, this court denied a temporary restraining order after a hearing and requested further briefing on the complex questions of law that had been raised. Thereafter defendants moved to dismiss and argument was

---

1. The islands of the Trust Territory are located in the Western Pacific Ocean north of the Equator. There are approximately 96 island units, variously small islands or atolls, which are scattered over an oceanic area larger than the continent of Australia or continental United States. The islands total land area, however, is only 687 square miles, and only 64 are regularly inhabited. See Trust Territory of the Pacific Islands 1960, 13th Annual Report to the United Nations (Dept. of State publication 7183, 1961).

The High Commissioner is the highest official in the executive branch of the Trust Territory Government. See *infra* at 655.

2. 61 Stat. 3301 (hereinafter "Trusteeship Agreement"). The Trusteeship Agreement was approved by the Security Council of the United Nations on April 2, 1947, and by the President of the United States on July 18, 1947, pursuant to a Joint Resolution of Congress of that date.

heard on February 13, 1973. The hearing on the preliminary injunction was postponed pending decision on the motions to dismiss.

After extensive consideration, it is my reluctant conclusion that: (1) the Trust Territory Government is not a federal agency subject to judicial review under the APA or NEPA, and (2) the Trusteeship Agreement does not vest plaintiffs with individual legal rights which they may assert in this court. For these reasons, jurisdiction is lacking and the motions to dismiss are granted. The other grounds urged in support of dismissal are without merit, and are rejected.

### Facts

On the basis of the well pleaded allegations of fact in the Complaint, which are taken as admitted for the purpose of these motions, it appears that sometime prior to October 20, 1970, Continental applied to the Trust Territory Government for permission to lease and build a hotel on public land at a site adjacent to Micro Beach, Saipan.

Micro Beach is a pleasant shaded beach which for many years has been the favorite beach of the people of Saipan. It is an important historical and cultural site and even during the previous German and Japanese administrations, it was set aside as an area to be preserved for use by the people of the island.

Although the hotel site is not directly on the beach, its proximity makes "it inevitable that construction of a hotel there will greatly reduce the desirability of Micro Beach to the people of Saipan and will, as a practical matter, deprive them of use of their most popular beach. In any society, a large increase in the number of persons using a beach or similar recreation area can greatly reduce the desirability of the area as a place to visit and relax. This is particularly true in Saipan, where many of the people, whether it be because of diffidence, courtesy, general cultural values or a long history of exposure to highhanded outsiders, do not feel free to use a beach occupied by tourists." Complaint ¶ 21.

In addition, it is alleged that construction of the hotel will triple the number of hotel rooms presently on Saipan resulting in further strain on the already overburdened power and water supplies, and damage to the ocean and reef by increased amounts of sewage discharge.

Pursuant to the requirements of the Trust Territory Code (hereinafter "T. T.C."), the Continental application was submitted to the Mariana Islands District Land Advisory Board [3] for its consideration. The Board unanimously recommended against the application suggesting that the area be reserved for public park purposes. This decision was communicated to the District Administrator of the Marianas District [4] and the High Commissioner by letter dated Octo-

---

3. All members of the Land Advisory Board are Trust Territory citizens and are appointed by the Mariana Islands District Administrator with the advice and consent of the Mariana Islands District Legislature. 67 T.T.C. § 53. See footnote 4, *infra*.

4. Saipan is part of the Mariana Islands District. For the purpose of administration, the islands of the Trust Territory are grouped into six districts, each with its own administrator and legislature. Subject to all territory-wide laws, the district governments are primarily responsible for support of public education and health, imposition and collection of sales taxes, construction and maintenance of secondary roads, domestic relations, inheritance law, land law, issuance of licenses for wholesale business and liquor control. 3 T.T.C. § 2.

Each district administrator is appointed by and serves at the pleasure of the High Commissioner. 3 T.T.C. § 51. In addition to his duties as representative for the High Commissioner, the district administrator is the chief executive officer of the district government. 3 T.T.C. § 52. (The court is informed that the Code has been amended to require the advice and consent of the Congress of Micronesia for all future appointments of district administrators).

ber 20, 1970. See Exhibit B of the Complaint.

For approximately one year no apparent action on the hotel project was taken. Then on October 15, 1971, a Micronesian News Service[5] release announced that the Trust Territory Government had tentatively approved a lease of the site to Continental "with final approval awaiting receipt of the completed papers." Complaint ¶ 25. Thereafter, protests against the proposal by various elected and community leaders, the Saipan Municipal Council[6] and the Mariana Islands District Legislature were communicated to the Interior Department and the High Commissioner.[7] Nevertheless, the lease was executed by Continental and High Commissioner Johnston on behalf of the Trust Territory Government on January 1, 1972.

The lease is for an initial period of 30 years with options to extend for two additional periods of 10 years each. Lease Agreement, arts. 1 and 2. Continental is granted the right to construct 200 rooms on the premises,[8] *id.* art. 27, and with the prior written permission of the Trust Territory Government to erect on the "public beach and in the waters of the lagoon adjacent thereto, facilities and structures, including docks and ramps related to and connected with *marine and beach activities*" of Continental's hotel. *Id.* art. 6.

It is undisputed that defendants have not complied with the requirements of NEPA, specifically section 4332(2)(C) which requires that "all agencies of the Federal Government" prepare a detailed environmental impact statement for "major Federal actions significantly affecting the quality of the human environment."

### NEPA Is Applicable In the Trust Territory

■ Defendants first ground in support of their motions to dismiss is that NEPA is not applicable to federal agencies operating in the Trust Territory. They urge this court to reconsider its recent decision in Enewetak v. Laird, 353 F.Supp. 811 (D. Hawaii decided January 19, 1973) holding that NEPA does apply to such agencies. It is argued that because there is no specific language in NEPA extending the statute's coverage to the Trust Territory, this court must restrict its application to the territorial jurisdiction of the United States. Foley Brothers, Inc. v. Filardo, 336 U.S. 281, 69 S.Ct. 575, 93 L.Ed. 680 (1949), is cited for this proposition, particularly language at page 285 of the opinion, 69 S.Ct. at page 576 which states that "the canon of construction which teaches that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States . . . is a valid approach whereby unexpressed congressional intent may be ascertained."

I am not persuaded. In my opinion, defendants misconstrue the thrust of the canon by ignoring the qualifying phrase "unless a contrary intent appears."

The question before the Court in *Foley Brothers* was whether the Eight

---

5. The Micronesian News Service is part of the Trust Territory Government's Department of Public Information.

6. The Saipan Municipal Council represents a third layer of government subordinate to the Trust Territory Government and the Mariana Islands District Government. Such councils are chartered by the High Commissioner when in his opinion such action is warranted by the circumstances and by the stage of development of the community. 4 T.T.C. § 1.

They are subject to all territory-wide laws and all district laws of their respective districts. 4 T.T.C. § 51.

7. Defendants have submitted a petition signed by various people in the Mariana Islands District supporting construction of the hotel. Defendants Exhibit 6. Plaintiffs admit that the project "is not without support" among the people of Saipan.

8. Plaintiffs allege that the hotel is to be eventually expanded to 500 rooms.

Hour Law [9] applied to a contract between the United States and a private American contractor for work performed on a construction project in Iraq and Iran. As noted by Justice Frankfurter, a literal reading of the statute would have resulted in its application since by its terms it covered "every contract made to which the United States . . . is a party." 336 U.S. at 291–292, 69 S.Ct. at 581 (concurring opinion). Instead, the Court looked to the Act as a whole, *id.* at 285–286, 69 S.Ct. 575, its legislative history, *id.* at 286–288, 69 S.Ct. 575, and administrative interpretations of it. *Id.* at 288–291, 69 S.Ct. 575. Finding nothing in any of this material that indicated a congressional purpose to extend the Act's coverage beyond the territorial jurisdiction of the United States, the Court concluded that the law was "inapplicable . . . in a foreign country over which the United States has no direct legislative control. . . ." [10] *Id.* at 290, 69 S. Ct. at 580.

Thus the Court did not adopt the mechanical rule proposed by defendants. Rather it looked to all available evidence of legislative intent before it arrived at a decision. Though a different result was reached, this is exactly the procedure followed in *Enewetak.* [11] Because this court concluded that both the language and legislative history of NEPA evidenced a congressional intent to apply the statute to all areas under United States control, the canon of construction cited by defendants "whereby unexpressed congressional intent may be ascertained" never became an issue.

No other reasons appearing for a reconsideration of this court's decision in *Enewetak,* it is reaffirmed and defendants' arguments rejected.

### Venue is Properly Laid in the District of Hawaii

Defendants Continental and High Commissioner Johnston contend that venue is improperly laid in this district because the Department of the Interior and its officials have not legally or adequately been served with process.

Plaintiffs rely on 28 U.S.C. § 1391(e) (Supp.1973) as authorization for effective extra-territorial service:

A civil action in which each defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, may . . . be brought in any judicial district in which: (1) a defendant in the action resides, or (2) the cause of action arose, or (3) any real property involved in the action is situated, or (4) the plaintiff resides if no real property is involved in the action.

9. The Eight Hour Law was repealed August 13, 1962. 76 Stat. 360. It had provided that "[e]very contract hereafter made to which the United States . . . is a party . . . shall contain a provision that no laborer or mechanic doing any part of the work contemplated by the contract, in the employ of the contractor or any subcontractor . . . shall be required or permitted to work more than eight hours in any one calendar day upon such work ; . . . "

10. It is interesting to note that while the United States does not have sovereignty in the Trust Territory, it very definitely has legislative control. As noted *infra* at 655, Department of the Interior Order No. 2918, pt. III § 2 provides that the Congress of Micronesia may not enact legislation inconsistent with the "treaties or international agreements" of the United States, "laws of the United States applicable to the Trust Territory," "Executive Orders of the President" and "Orders of the Secretary of the Department of Interior." See also, 2 T.T.C. § 102.

11. Indeed, in every reported case requiring judicial interpretation of the applicability of ambiguous legislation to the Trust Territory, the courts have looked to all available evidence to discover the intent of Congress. See Aradanas v. Hogan, 155 F.Supp. 546 (D.Hawaii 1957) (Immigration and Nationality Act) ; Application of Reyes, 140 F.Supp. 130 (D.Hawaii 1956) (Immigration and Nationality Act) ; Callas v. United States, 253 F.2d 838 (2d Cir. 1958) (Tort Claims Act) ; Brunell v. United States, 77 F.Supp. 68 (S.D.N.Y.1948) (Tort Claims Act).

█ It is first argued that the section is not applicable here because the requirement that "each defendant" be an officer or employee of the United States is violated by the joinder of Continental, a private corporation. Though this argument is supported by the literal language of section 1391(e), it is obviously inconsistent with the spirit and intent of the provision. See Judge Body's discussion in Powelton Civic Home Owners Ass'n v. Department of Housing & Urban Development, 284 F.Supp. 809, 832–834 (E.D.Pa.1968). The better rule, supported by virtually all courts which have considered this problem,[12] is that the requirement refers only to defendants who are beyond the forum's territorial limits. Thus the presence of Continental is simply not relevant to the extraterritorial operation of section 1391(e).[13]

█ Secondly, it is asserted that with respect to the Interior Department and its officials venue is improperly laid in this district because none of the requirements set out in subsections (1) through (4) of section 1391(e) have been met. It is suggested that proper venue would be in Washington, D. C., the official residence of these defendants.

It is not necessary to decide this question because the Interior Department, Secretary Morton and Deputy Assistant Secretary Carpenter have all waived their objections to venue.[14] Because venue is a privilege personal to each defendant, Continental and Johnson are precluded from objecting that venue is improper as to the other defendants. Camp v. Gress, 250 U.S. 308, 39 S.Ct. 478, 63 L.Ed. 997 (1919); McKenna v. Udall, 135 U.S.App.D.C. 335, 418 F.2d 1171, 1176–1177 (1969).

### Plaintiffs Have Standing

█ Defendants move on two separate grounds to dismiss the Complaint because plaintiffs lack standing: (1) plaintiffs have failed to allege the requi-

12. Powelton Civic Home Owners Ass'n. v. Department of Housing & Urban Development, *supra* at 832–834; Liberation News Service v. Eastland, 426 F.2d 1379, 1382 n. 5 (2d Cir. 1970); Kletschka v. Driver, 411 F.2d 436, 442 (2d Cir. 1969) Brotherhood of Locomotive Engineers v. Denver & R.G.W. R.R., 290 F.Supp. 612, 615–616 (D.Colo.1968), aff'd. on other grounds, 411 F.2d 1115 (10th Cir. 1969); Coalition for United Community Action v. Romney, 316 F.Supp. 742, 746–747 (N.D. Ill.1970); McKenna v. Udall, 135 U.S. App.D.C. 335, 418 F.2d 1171, 1176 (1969); Heath v. Aspen Skiing Corp., 325 F.Supp. 223, 229 (D.Colo.1971); English v. Town of Huntington, 335 F. Supp. 1369, 1373 (E.D.N.Y.1970), aff'd. on other grounds, 448 F.2d 319 (2d Cir. 1971); Macias v. Finch, 324 F.Supp. 1252, 1254–1255 (N.D.Cal.1970). *Contra*, Chase Savings & Loan Ass'n. v. Federal Home Loan Bank Board, 269 F.Supp. 965, 967 (E.D.Pa.1967).

13. Defendant Continental resides in this district because it does business here, see 28 U.S.C. § 1391(c) (Supp.1973), and was *personally served pursuant to Rules* 4(d)(3) and 4(b) of the Federal Rules of Civil Procedure. Defendant High Commissioner Johnston was personally served· in this district on January 15,

1973. He has not raised any specific venue objections although he has moved this court to quash a subpoena issued to require the taking of his deposition. In view of my conclusion that the High Commissioner is an official of the Department of the Interior, *infra*, at 657–658; he would be subject to extra-territorial service to the same extent as any other official in the Department. While the APA exclusion precludes judicial review in most instances, there is no reason to believe that it provides an exemption from the venue statutes.

14. The reason for their waiver is found in Exhibit B of the Governmental Defendants Memorandum in Support of Motion to Dismiss which is a letter from the Department of Interior to the Department of Justice dated January 24, 1973. On page 7 it is stated:

5. We believe your Department is better qualified to evaluate the venue question. We might note, however, that since *General Constructors* is a valuable precedent for the Hawaii District, it might be better to stay there, particularly since review would be in the Ninth Circuit which we think would be more knowledgeable about and sympathetic to our position than would the D.C. Circuit.

site interest in the controversy as defined by Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 36 (1972); and (2) as nonresident aliens, plaintiffs have no standing to sue, relying on Pauling v. McElroy, 107 U.S. App.D.C. 372, 278 F.2d 252 (1960) Both arguments are without merit.

In Sierra Club v. Morton, *supra*, the Sierra Club sought a declaratory judgment and an injunction to restrain federal officials from approving an extensive skiing development in the Mineral King Valley in the Sequoia National Forest. The Supreme Court held that the Club lacked standing because it had asserted no individualized harm to itself or its members: "Nowhere in the pleadings or affidavits did the Club state that its members use Mineral King for any purpose, much less that they use it in any way that would be significantly affected by the proposed actions of the respondents." 405 U.S. at 735, 92 S.Ct. at 1366.

In the instant case plaintiffs clearly have alleged facts in the Complaint which satisfy the *Sierra Club* test. Paragraph 3 of the Complaint states that:

Most of the plaintiffs regularly use Micro Beach in Saipan for swimming, fishing and picnicking, and regard it as one of their favorite beach areas in Saipan. They would be effectively deprived of their use of Micro Beach if

construction of the Continental hotel takes place as presently contemplated.

In addition, paragraph 35 alleges that the hotel will create a sewage problem, paragraphs 36 and 37 that it will deleteriously affect the power and water supply, and paragraph 39 that its height will have "a significant aesthetic effect upon the people of Saipan." By such allegations, plaintiffs have shown that they will be "adversely affected" by the construction of the hotel and that they have more than merely general "interest in the problem." See Sierra Club v. Morton, *supra* 405 U.S. at 739–740, 92 S.Ct. 1361.

Moreover, in view of this court's conclusion that NEPA is applicable in the Trust Territory, plaintiffs' status as nonresident aliens does not detract from their standing to sue. Enewetak v. Laird, *supra* 353 F.Supp. at 820 n. 14. Nor do they lack standing under the APA. Constructores Civiles de Centroamerica, S. A. v. Hannah, 148 U.S.App. D.C. 159, 459 F.2d 1183, 1189–1191 (1972). The footnote in Pauling v. McElroy, *supra* 278 F.2d at 254 n. 3, to the effect that "non-resident aliens . . . plainly cannot appeal to the protection of the Constitution or laws of the United States" is an incomplete statement of the law.[15] There are many instances where nonresident aliens have been allowed to sue in United States courts to protect their property or personal rights.[16] Indeed, the Supreme Court has

15. The District of Columbia Circuit has subsequently "clarified" its holding in Pauling v. McElroy. In Constructores Civiles de Centroamerica, S.A. v. Hannah, *supra* 459 F.2d at 1190 n. 13, it stated: Citing Johnson v. Eisentrager, *supra* [339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255], we have denied standing to nonresident aliens *who have not alleged specific threatened injury* in challenging the detonation of a nuclear device. Pauling v. McElroy, 107 U.S.App.D.C. 372, 278 F.2d 252 (1960). (Emphasis added).

16. See, e. g., Wilderness Society v. Morton, 463 F.2d 1261 (D.C.Cir.1972) (Canadian environmental group allowed to intervene

in federal district court suit testing Interior Secretary's compliance with NEPA prior to granting Alaska pipeline permits); Constructores Civiles de Centroamerica, S.A. v. Hannah, *supra* (Honduran corporation had standing to sue Agency for International Development in connection with disqualification of the corporation as a bidder on road construction contract); Puente de Reynosa, S.A. v. City of McAllen, 357 F.2d 43 (5th Cir. 1966) (Mexican corporation owning Mexican end of a Rio Grande River bridge had standing to sue for injunction restraining construction of new bridge by city on grounds that city had failed to secure congressional consent for the new structure).

said that "[a]lien citizens, by the policy and practice of the courts of this country, are ordinarily permitted to resort to the courts for the redress of wrongs and the protection of their rights." The Disconto Gesellschaft v. Umbreit, 208 U.S. 570, 578, 28 S.Ct. 337, 339, 52 L.Ed. 625 (1908).

Accordingly, this court will not deny plaintiffs standing in this suit because of their status as nonresident aliens where no such congressional intent is manifested in either NEPA or the APA.

### Abstention Not Required

Defendants note that an identical suit is pending in the High Court of the Trust Territory and request that this court abstain from further proceeding until such time as that suit is concluded.

Without getting into the difficult question of what deference is required as a general rule with respect to cases pending in the High Court, it does not appear that abstention is required in this case. Although the case in the High Court arose from the same transaction as did this one, it does not include all the defendants named herein and it appears that the primary issue remaining before that court involves the construction of a Trust Territory statute not at issue here. Moreover, the Chief Justice of the High Court has entered an order denying a motion by Continental and the High Commissioner which sought to enjoin the plaintiffs from

pursuing their remedies in this court. He also, on his own motion, stayed further proceedings in the High Court during the pendency of the action in this court.

Under the circumstances, abstention would serve little purpose and might well lead to unnecessary expense and duplication of effort.

### The Trust Territory Government Is Not a Federal Agency Subject to Review Under NEPA or the APA

By its terms NEPA is applicable only to major actions of "agencies of the Federal Government." See 42 U.S.C. § 4332 (Supp.1973). Defendants assert that the Trust Territory Government is not such an agency because (1) the Trust Territory is a foreign country and its government immune to suits in United States courts, or alternatively (2) that the Trust Territory Government is a government of a United States territory or possession within the meaning of 5 U.S.C. § 701(b)(1)(C) and excluded from judicial review.[17]

Under international law the Trust Territory occupies a unique position. By virtue of Article 3 of the Trusteeship Agreement the United States has "full powers of administration, legislation, and jurisdiction" over the territory, allowing in practical effect the exercise of full sovereign power although technically sovereignty resides elsewhere.[18] Beyond these full administrative powers normally granted to ad-

---

17. The APA, which provides for judicial review of "agency action," see 5 U.S.C. § 702, defines an agency as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency." 5 U.S.C. § 701(b)(1). However, it is further provided that this definition does not include, inter alia, "the governments of the territories or possessions of the United States." 5 U.S.C. § 701(b)(1)(C).

18. As noted by Francis D. Sayre, United States Representative in the Trusteeship Council and President of the Council, in his learned article on "Legal Problems

Arising from the United Nations Trusteeship System," 42 Am.J.Int'l.L. 263, 271 (April, 1948):

In the first place, there seems to be general concurrence with respect to the present trust territories, as there was with respect to the mandated territories, that wherever sovereignty does rest it is not in the administering power. This view has been re-enforced by statements of the United States, the United Kingdom and Australia as administering authorities of trust territories. Each of these has stated on separate occasions that it does not regard its administration of the trust territory as implying any claim of sovereignty.

ministering authorities in United Nations trusteeship agreements,[19] the Trust Territory is the only area designated as a "strategic" trust. Trusteeship Agreement, art. 1. This designation results in the United States being responsible to the Security Council for administration of the Trust Territory— where the United States possesses veto power [20]—rather than the General Assembly. It also permits preferential treatment of the United States in economic and commercial matters,[21] and allows this country unilaterally to declare all or any part of the islands a closed area within which the United States may determine the extent to which trustee functions shall be exercised and from which it may bar anyone, including the United Nations.[22] See the dissent of Judge Lumbard in Callas v. United States, 253 F.2d 838, 842–844 (2d Cir. 1958).

Finally, in common with all trusteeship agreements negotiated with the United Nations, the Trusteeship Agreement may not be altered, amended or terminated without the consent of the United States. Trusteeship Agreement, art. 15.

The Congress authorized the President to vest the administrative power conferred on the United States by the Trusteeship Agreement "in such person or persons" to be exercised "in such manner and through such agency or agencies as the President . . . may direct or authorize." 48 U.S.C. § 1681(a) (Supp.1973). In Executive Order 11021, 3 C.F.R. 600 (1959–63 Compilation), 48 U.S.C. § 1681 (Supp.1973), the President delegated authority to the Secretary of the Interior as follows:

Section 1. *Responsibility of Secretary of the Interior.* The responsibility for the administration of civil government in all of the trust territory, and all executive, legislative, and judicial authority necessary for that administration, are hereby vested in the Secretary of the Interior. . . . [T]he Secretary . . . shall take such actions as may be necessary and appropriate to carry out the obligations assumed by the United States as the administering authority of the

---

19. After World War II, eleven trusteeships were set up pursuant to agreements between the United Nations and various nations. The United States' administration of the Trust Territory and Australia's administration of New Guinea are the only trusteeships still in effect.

20. See Article 27 of the Charter of the United Nations.

21. See Article 8(1) of the Trusteeship Agreement which provides:
    In discharging its obligations under Article 76(d) of the [United Nations] Charter . . . the administering authority . . . shall accord to nationals of each Member of the United Nations and to companies and associations organized in conformity with the laws of such Member, treatment in the trust territory no less favourable than that accorded therein to nationals, companies and associations of any other United Nation *except the administering authority.* (Emphasis added).
    This article is the same as that contained in the draft trusteeship agreement submitted by the United States. The comment accompanying the United States proposal made it clear that the basis for preferential treatment of the United States was the "strategic" status of the Trust Territory. See Draft Trusteeship Agreement for the Japanese Mandated Islands, With Article by Article Explanatory Comments, (Department of State Publication, February 26, 1947) at 5–6, in 1 Whiteman, Digest of Int'l Law 810–811 (Released June, 1963).

22. See Article 13 of the Trusteeship Agreement which provides:
    The provisions of Articles 87 and 88 of the [United Nations] Charter [relating to reports, petitions, visits and questionnaires concerning non-strategic areas] shall be applicable to the trust territory, *provided that the administering authority may determine the extent of their applicability to any areas which may from time to time be specified by it as closed for security reasons.* (Emphasis added).
    See also discussion in 1 Whiteman, *supra* at 824–830.

trust territory under the terms of the trusteeship agreement and under the Charter of the United Nations.

. . .

Sec. [sic] 2. *Redelegation of authority.* The executive, legislative, and judicial authority provided for in section 1 of this order may be exercised through such officers or employees of the Department of the Interior, or through such other persons under the jurisdiction of the Secretary of the Interior, as the Secretary may designate, and shall be exercised in such manner as the Secretary, or any person or persons acting under the authority of the Secretary, may direct or authorize.

Pursuant to this authority, the Secretary issued a series of Secretarial Orders dealing with the civil administration of the Trust Territory which have been superseded and consolidated in Department of the Interior Order No. 2918 (December 27, 1968) (hereinafter "Order No. 2918"). This Order, as amended, creates a basically republican form of government in the Trust Territory with executive, legislative and judicial branches.

Executive authority is vested in the High Commissioner to "be exercised and discharged under the supervision and direction of the Secretary." Order No. 2918, pt. II § 1. The High Commissioner is appointed by the President of the United States with the advice and consent of the Senate. 48 U.S.C. § 1681(a) (Supp.1973). Thus his authority does not come from the people of the Trust Territory, nor do they have any method of removing him when dissatisfied with his actions or policies.

Legislative authority has been delegated to the Congress of Micronesia, consisting of a Senate and House of Representatives, whose members are elected by the citizens of the Trust Territory. Order No. 2918, pt. III §§ 1, 2, 5, 7 and 8. The power of the Congress is circumscribed, however, by the provision that it may not enact legislation inconsistent with the laws of the United States applicable to the Trust Territory, treaties or international agreements of the United States, Executive Orders of the President or orders of the Secretary of the Interior. *Id.* § 2. Moreover, every bill passed by the Congress is subject to veto by the High Commissioner. His veto may be overridden by a two thirds majority of the entire membership of both Houses, but the re-enacted bill is still subject to veto by the Secretary of the Interior. The Secretary's action is final and may not be overridden. *Id.* § 13.

Judicial authority is vested in High Court which is independent of the executive and legislative powers. Order No. 2918, pt. IV. The Secretary appoints the Chief Justice and all Associate Justices free from any control by the Congress of Micronesia.

In addition, Order No. 2918 specifies that the relations of the Trust Territory Government with the Congress of the United States on all legislative matters, including appropriations, shall be conducted through the Department of the Interior. Pt. II § 2. Likewise, contact with other Federal agencies and communications with foreign governments and international bodies must go through and be cleared by the Department. Pt. II §§ 4 and 5.

Upon consideration of all of the above, it is my opinion that the United States exercises a maximum degree of control which is inconsistent with the assertion that the Trust Territory is a foreign country. *My decision is reinforced by the fact that there does not appear to have been any significant delegation of authority to the citizens of the Trust Territory.*[23] The United States, acting

23. *The court is informed that this situation will probably change as a result of the Micronesian Future Political Status Talks now under way between Ambassador* Franklin Williams of the United States and representatives of the Congress of Micronesia.· See Official Records of the Fourth Round of Micronesian Future Po-

through the Secretary of the Interior, controls the High Commissioner and retains an absolute veto over all legislation enacted by the Congress of Micronesia. Accordingly, without determining exactly what status the Trust Territory occupies, I hold that it is not a foreign country entitled to immunity from suits in United States courts.

The cases cited by defendants for the proposition that the Trust Territory is a foreign country are not to the contrary. Brunell v. United States, 77 F.Supp. 68 (S.D.N.Y.1948) and Callas v. United States, 253 F.2d 838 (2d Cir. 1958) turn on a construction of the term "foreign country" as used in the Tort Claims Act. See 28 U.S.C. § 2680(k). Similarly, Application of Reyes, 140 F.Supp. 130 (D. Hawaii 1956) and Aradanas v. Hogan, 155 F.Supp. 546 (D.Hawaii 1957) construe the term "foreign state" as used in the Immigration and Nationality Act. See 8 U.S.C. § 1101(a)(14). None of these cases go outside the scope of the particular act under consideration [24] and the legal status of the Trust Territory Government was never an issue.

▇ While avoiding the Trust Territory Government's claim of sovereign immunity as the government of a foreign country, plaintiffs cannot also avoid the APA's exclusion of "the governments of the territories or possessions of the United States" from judicial review. 5 U.S.C. § 701(b)(1)(C). Admittedly, the Trust Territory is technically not a territory or possession because the United States does not have sovereignty. This distinction is immaterial, however, because the legislative history of the APA makes it clear that Congress intended to exclude from judicial review *all* governments created pursuant to the authority of Congress.

▇ Senator McCarran, Chairman of the Senate Judiciary Committee, made these remarks in reporting on the Senate Bill that, with only minor clarifications and corrections, was enacted as the APA:

> As it has been reported to the Senate, the committee feels that it has avoided the mistake of attempting to oversimplify this measure. It has not hesitated, therefore, to state functional classifications and exceptions where those could be rested upon firm grounds. In so doing, *the committee has followed the undeviating policy of dealing with types of functions as such and in no case dealing with administrative agencies by name.* That point is important, and I will repeat it if I may. The committee has not deviated from the policy of dealing with types of functions as such, and the bill in no case deals with administrative agencies by name. (Emphasis added). 92 Cong.Rec. 2150 (1946).

This theme is reiterated in the House Judiciary Committee Report:

> Functional classifications and exemptions have been made, but in no part of the bill is any agency exempted by name. *The bill is meant to be operative 'across the board' in accordance with its terms, or not at all. Where one agency has been able to demonstrate that it should be exempted, all like agencies have been exempted in general terms.* (See sec. 2(a) ). Where one agency has shown that some particular operation should be exempted from any particular requirement, the same function in all agencies has been exempted. No agency has been favored by special treatment. (Emphasis added. H.Rep.No.1980, in 1946 U.S.Code Cong. & Ad.News 1195, 1205.

---

litical Status Talks (Released by the Office of Micronesian Status Negotiations, Washington, D. C. 1972). However, at the time of the filing of this action, Order No. 2918 was still in full effect.

24. See Brunell v. United States, *supra* 77 F.Supp. at 69, 72; Callas v. United States, *supra* 253 F.2d at 840; Application of Reyes, *supra* 140 F.Supp. at 131–132; Aradanas v. Hogan, *supra* 155 F. Supp. at 547.

In view of this clearly expressed congressional intent to operate "across the board" and exempt "all like agencies . . . in general terms," this court concludes that the Trust Territory Government is excluded from review under sections 701 to 706 of the APA. The fact that the United States is technically without sovereignty in the Trust Territory is, under the circumstances, a distinction without a difference.

This conclusion is supported by reference to United States administration of American Samoa. Its government is virtually identical to that of the Trust Territory insofar as the power of the Secretary of the Interior or the important Samoan governmental bodies are concerned.[25] Judge Tavares of this district held that the APA exclusion is applicable to the civil government in Samoa. General Constructors Company of Nevada v. Morton, Civ.No. 71–3409 (D. Hawaii decided September 16, 1971) (Unpublished Opinion). Thus under the rule that all like agencies should be exempted from the operation of the APA, the Trust Territory Government should likewise be excluded.[26]

■ Plaintiffs argue that a distinction must be drawn between the High Commissioner and the other branches of the Trust Territory Government, and that in order to prevail they need only establish that the High Commissioner is a "federal agent." See Plaintiffs' Memorandum In Response to Defendants' Motions to Dismiss at 3–18. While I accept plaintiffs' argument that under general principles of agency law and court decisions defining the term "federal agency",[27] the High Commissioner and his immediate subordinates in the executive branch of the Trust Territory Government are federal officials operating as a component of the Department of the Interior, it does not alter my conclusion that the APA exclusion is applicable in this case. To exempt federal officials serving as officers of the governments of the territories and possessions from United States laws governing federal agency action was obviously the reason for the exclusion. Whether the Trust Territory Government is considered as a whole, or the High Commissioner by himself, the result is the same.[28]

25. Compare 48 U.S.C. § 1661(c) (Supp. 1973) with 48 U.S.C. § 1681(a) (Supp. 1973); Executive Order No. 10264, 16 F.R. 6419, with Executive Order No. 11021, 3 C.F.R. 1959; Department of the Interior Order No. 2657, as amended, with Department of the Interior Order 2918, as amended.

26. See Harris v. Boreham, 233 F.2d 110 (3rd Cir. 1956), where it was held that the government of the Virgin Islands, including two municipalities into which it was divided, was not a "federal agency" within the meaning of the Tort Claims Act, nor was the Superintendent of Public Works of one of these divisions an officer or employee of a federal agency while he was supervising the maintenance of streets even though his salary was paid from federal funds, and he was appointed by the Secretary of the Interior.

27. See, e. g., Domenech v. National City Bank, 294 U.S. 199, 55 S.Ct. 366, 79 L.Ed. 857 (1935); Standard Oil Co. of California v. Johnson, 316 U.S. 481, 62 S.Ct. 1168, 86 L.Ed. 1611 (1942); Korman v.

Federal Housing Administrator, 72 App. D.C. 245, 113 F.2d 743 (1940); Lassiter v. Guy F. Atkinson Co., 176 F.2d 984 (9th Cir. 1949).

28. On the basis of affidavits submitted by the parties and testimony at the hearing on the Motion for a Temporary Restraining Order and again at the hearing on the Motions to Dismiss, it is clear that plaintiffs' allegations that the decision to approve the lease agreement was made or dictated by officials in the Department of the Interior are without foundation. The lease approval was a "local" decision of the High Commissioner acting within the scope of his duties as chief executive of the Trust Territory Government. The officials of the Interior Department did not negotiate, counsel, advise or participate in the decision. Nor was the lease ever sent to the Department for approval or concurrence in any form. Because unwarranted inferences of fact may not preclude dismissal, see 2A Moore's Federal Practice § 12.08, this allegation has not been admitted for the purposes of these motions.

Having concluded that the Trust Territory Government is exempt from judicial review under the APA, it follows that it is also immune under the provisions of NEPA. No reason is apparent—and plaintiffs cite none—why the same rules on the scope of review should not be applied. Accordingly, the action of High Commissioner Johnston approving and executing the lease agreement is not "federal" action within the meaning of NEPA.

### Approval of the Lease Agreement is Major Action Within the Meaning of NEPA

Though their argument is not entirely clear, it appears that defendants assert not only that the High Commissioner's approval of the lease agreement is not federal agency action but that it is not "major" action within the meaning of NEPA.

This contention has been settled adversely to defendants by Davis v. Morton, 469 F.2d 593 (10th Cir. decided November 24, 1972). The issue in that case was whether approval by the Secretary of the Interior of a 99-year lease of Indian lands executed by an Indian tribe and a development company constituted major federal action. The United States did not initiate the lease, was not a party, possessed no interest in either the lease or the development, and did not participate financially or benefit from the lease in any way. Nonetheless, the Court held that "approving leases on federal lands constitutes major federal action and thus must be approved according to NEPA mandates." 4 E.R.C. at 1738. See also, Greene County Planning Board v. Federal Power Commission, 455 F.2d 412 (2d Cir. 1972) (License to construct a high voltage power line conceded by all parties to be a major action); Izaak Walton League of America v. Schlesinger, 337 F.Supp. 287 (D.D.C.1971) (Issuance of an interim operating license for a nuclear power plant held to be major action); City of New York v. United States, 337 F. Supp. 150 (E.D.N.Y.1972) (Interstate Commerce Commission order authorizing abandonment of a railroad line held to be major action).

Thus it is clear that the approval and execution of the lease of public lands in the instant case is "major" action within the meaning of NEPA.

### Trust Territory Government Does Not Have Sovereign Immunity When Sued For Violations of an Act of Congress

Defendants claim that action against High Commissioner Johnston is actually directed against the Trust Territory and is therefore barred by sovereign immunity.[29] To the extent that this claim is based on their previous argument that the Trust Territory is a foreign country, it has already been rejected. However, defendants also argue that the Trust Territory possesses attributes of sovereignty equivalent to a state government, relying principally on Kawananakoa v. Polyblank, 205 U.S. 349, 27 S.Ct. 526, 51 L.Ed. 834 (1907).

It appears to be clear that there are degrees or attributes of sovereignty, and that a government may be entitled to and enjoy some of these attributes without necessarily having all of them.

In the *Kawananakoa* case, Justice Holmes held that the Territory of Hawaii was immune from suit without its consent on the following basis:

A sovereign is exempt from suit, not because of any formal conception or obsolete theory, but on the logical and practical ground that *there can be no legal right as against the authority that makes the law on which the right depends.* . . .

As the ground is thus logical and practical, the doctrine is not confined to powers that are sovereign in the

---

**29.** Of course, sovereign immunity would be no defense if the Trust Territory Government had been construed to be a federal agency subject to judicial review under NEPA and the APA. See Kalur v. Resor, 335 F.Supp. 1, 8–9 (D.D.C.1971).

full sense of juridical theory, but naturally is extended to those that, in actual administration, originate and change at their will the law of contract and property, from which persons within the jurisdiction derive their rights. A suit presupposes that the defendants are subject to the law invoked. Of course it cannot be maintained unless they are so. But that is not the case with a territory of the United States, because the territory itself is the fountain from which rights ordinarily flow. It is true that Congress might intervene, just as in the case of a state the Constitution does, and the power that can alter the Constitution might. But the rights that exist are not created by Congress or the Constitution, except to the extent of certain limitations of power. 205 U.S. at 353–354, 27 S.Ct. at 527. (Emphasis added).

In the instant case, the same principles apply.

▆▆▆ As previously discussed, the Trusteeship Agreement gives the United States full powers of legislation in the Trust Territory. With respect to local matters, this power has been delegated to the Congress of Micronesia along the lines followed in organizing the territories and possessions of the United States. On the basis of the principles outlined in *Kawananakoa*, I believe that this delegation of local legislative power gave the Trust Territory what has been referred to as "quasi-sovereignty" or "qualified sovereignty," carrying with it the attribute of immunity from suit without its own consent. See Porto Rico

v. Rosaly y Castillo, 227 U.S. 270, 33 S. Ct. 352, 57 L.Ed. 507 (1913); People of Puerto Rico v. Shell Co., 302 U.S. 253, 58 S.Ct. 167, 82 L.Ed. 235 (1952); Harris v. Boreham, 233 F.2d 110 (3rd Cir. 1956); Harris v. Municipality of St. Thomas and St. John, 212 F.2d 323 (3rd Cir. 1954).

This immunity, however, cannot be extended to include suits under a statute of the United States applicable in the Trust Territory. Such statutes confer rights which are not dependent on local authority—indeed, they supersede local law [30]—and thus are not within the rule set out in *Kawananakoa*. Near the end of the opinion Justice Holmes specifically notes that "the rights [under consideration] . . . are not created by Congress or the Constitution, except to the extent of certain limitations of power." 205 U.S. at 354–355, 27 S.Ct. at 527.

In my opinion, then, the delegation of legislative power to the Congress of Micronesia which created a qualified sovereignty in the Trust Territory as respects its own laws did not create any immunity from suits under an act of Congress such as NEPA. If there is immunity, it must be found elsewhere.

The Trusteeship Agreement Does Not Vest Plaintiffs With Individual Legal Rights Which May Be Asserted In This Court

▆▆▆ Plaintiffs allege that under the Trusteeship Agreement, particularly Article 6(2) which states that the administering authority shall "protect the inhabitants against the loss of their lands and resources," the United States undertook a "sacred trust" [31] which requires

---

30. Order No. 2918, pt. III § 2(b) provides:

> *Legislative Power.* The legislative power of the Congress of Micronesia shall extend to all rightful subjects of legislation, except that no legislation may be inconsistent with
> 
>    *     *     *     *     *
> 
>    (b) laws of the United States applicable to the Trust Territory. . . .

31. Article 73 of the Charter of the United Nations states that:

> Members of the United Nations which have or assume responsibilities for the administration of territories whose peoples have not yet attained a full measure of self-government recognize the principle that the *interests of the inhabitants of these territories are paramount, and accept as a sacred trust the obligation to promote to the utmost . . .* the well-being of the inhabitants of these territories. . . . " (Emphasis added).

compliance with NEPA in all major actions affecting the environment. In support of their position, they cite *Pyramid Lake Paiute Tribe v. Morton*, 354 F.Supp. 252 (D.D.C. decided November 9, 1972) and *Davis v. Morton*, 469 F.2d 593 (10th Cir. decided November 24, 1972) which held that exacting fiduciary standards governed the Secretary of the Interior's actions that affected respectively water and land rights of American Indian tribes.

While the analogy to American Indians may be apt in some respects, I do not believe that the principles of *Pyramid Lake Paiute Tribe* and *Davis* can be relied upon in this case. The "trust responsibility" of the United States as administering authority of the Trust Territory arises out of the Trusteeship Agreement. As discussed above, this document designates the islands as a "strategic" area and thus accords the United States unique and virtually unfettered rights of administration. Under these circumstances, it appears to be entirely inappropriate to apply the usual rules of interpretation for trust agreements and fiduciary obligations.

I conclude with Judge Keech in *Pauling v. McElroy*, 164 F.Supp. 390, 393 (D.D.C.1958) that:

> The provisions of the . . . Trusteeship Agreement for the Trust Territory of the Pacific Islands . . . are not self-executing and do not vest any of the plaintiffs with individual legal rights which they may assert in this Court. The claimed violations of such international obligations and principles may be asserted only by diplomatic negotiations between the sovereignties concerned.

### Other Allegations

Finally, the pro forma allegations that the Complaint does not "contain a short and plain statement of the claim" as required by Rule 8(a)(2) of the Federal Rules of Civil Procedure, and that plaintiffs have been guilty of laches, are without merit.

Therefore, based on my conclusion that neither the APA nor NEPA provide for judicial review of the actions complained of and that the Trusteeship Agreement does not vest plaintiffs with legal rights enforceable in this court, the Motions to Dismiss are granted.

It is so ordered.