**SABLAN CONSTRUCTION COMPANY,**
**Plaintiff-Appellee,**

v.

**GOVERNMENT OF the TRUST TERRITORY OF the PACIFIC ISLANDS,**
**Defendant-Appellant.**

**No. DCA 80–9025.**

United States District Court,
N. Mariana Islands,
Appellate Division.

Nov. 4, 1981.

Ramon Villagomez, Saipan, Mariana Islands, for plaintiff-appellee.

Andrew Wilson, Atty. Gen. Office, Saipan, Mariana Islands, for defendant-appellant.

Before DUENAS and CONTI, District Judges, and SOLL, Designated Judge.*

## OPINION

SOLL, Designated Judge:

The Trust Territory appeals the trial court's decision ordering it to refund import taxes paid by the Sablan Construction Company. There are two issues presented. One is whether the trial court had subject matter jurisdiction. The other is whether, in an action under 6 T.T.C. § 251(1)(a), Sablan may recover wrongfully assessed taxes which it paid without protest. Because our answer to both questions is yes, we affirm.

## FACTS

From January 1974 until December 1977 Sablan paid $40,779.74 in taxes to the Trust Territory on materials imported for use in construction projects. Sablan paid the taxes without protest under the erroneous belief that 77 T.T.C. § 53 required remittance. That statute imposed import taxes on goods brought into the Trust Territory for resale.[1]

---

* Commonwealth Trial Court Judge sitting pursuant to 48 U.S.C. § 1694b.

1. On January 12, 1979, Northern Marianas Public Law No. 1–21 repealed 77 T.T.C. § 53. Sections 4 and 5 of 1–21 are substantially similar to the Trust Territory statute.

On November 5, 1975, the Trust Territory Attorney General issued an opinion stating that import taxes do not apply to materials used in construction projects and not resold. The company did not request a refund until December 1979. The Trust Territory denied the request.

Lacking an administrative remedy, Sablan filed a refund action under 6 T.T.C. § 251(1)(a)[2] on December 18, 1979. The Trust Territory moved to dismiss for lack of jurisdiction. It argued that under the Foreign Sovereign Immunities Act it is a foreign state or government immune from federal court jurisdiction. The trial court, U.S. District Judge Alfred Laureta presiding, ruled that it had jurisdiction under 48 U.S.C. § 1694a(b) and denied the motion.

On October 20, 1980, the trial court, U.S. District Judge Paul Hatfield presiding, held that the import taxes were illegally assessed and collected. It entered judgment for Sablan and this appeal followed.

## I.

## JURISDICTION

The threshold issue is whether the trial court had subject-matter jurisdiction. The Trust Territory advances two arguments against jurisdiction: (1) the Trust Territory is a foreign government immune from federal court jurisdiction under the Foreign Sovereign Immunities Act;[3] (2) the Trust Territory High Court's jurisdiction over tax refund actions under 6 T.T.C. § 251(1)(a) is exclusive and remains unaffected by the United States Congress' approval of § 402(b) of the Covenant and enactment of 48 U.S.C. § 1694a(b).[4] We reject these contentions.

### A. Foreign Sovereign Immunity

■ The Trust Territory's claim of foreign sovereign immunity ignores controlling contrary precedent on the issue. *People of Saipan v. U. S. Department of Interior*, 356 F.Supp. 645 (D.Haw. 1973), *aff'd as modified on other grounds* 502 F.2d 90 (9th Cir. 1974), *cert. denied* 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761, (1975), established that the Trust Territory is not a jurisdictionally immune foreign government. After documenting the United States' significant control over the Trust Territory, the district court ruled that the Territory is not a foreign country immune from suits in United States courts. 356 F.Supp. at 655–656. The Ninth Circuit affirmed this conclusion. 502 F.2d at 94–95.

The passage of the Foreign Sovereign Immunities Act in 1976 did not alter the rule enunciated in *People of Saipan*.[5] Section 1603(c) distinguishes the "United States" from an immune "foreign state" by

**2.** 6 T.T.C. § 251(1)(a) states in relevant part: Actions upon the following claims may be brought against the Government of the Trust Territory ... (a) Civil actions ... for the recovery of any tax alleged to have been erroneously or illegally collected ...

**3.** 28 U.S.C. § 1602–1611. Section 1604 provides that a "foreign state" is immune from federal and state court jurisdiction except under circumstances described elsewhere in the Act.

**4.** On March 24, 1976, the United States Congress approved § 402(b) as part of the Covenant to Form a Commonwealth of the Northern Mariana Islands In Political Union With The United States of America. P.L. 94–241, 90 Stat. 263, 48 U.S.C. § 1681 note. To effectuate § 402(b), on November 8, 1977 Congress enacted 48 U.S.C. § 1694a(b). The language of § 402(b) and § 1694a(b) is identical. The pertinent jurisdictional provisions state that one

component of the federal district court's jurisdiction includes:

... all causes in the Northern Mariana Islands (not arising under the Constitution, treaties, or laws of the United States) ... jurisdiction over which is not vested by the Constitution or laws of the Northern Mariana Islands in a court or courts of the Northern Mariana Islands ...

**5.** The Act had two primary purposes. One was to codify the "restrictive" principle of sovereign immunity under international law. Under this principle, a foreign state's jurisdictional immunity extends only to its "public" acts and not to its commercial acts or to those which private persons or entities also perform. The second purpose was to ensure that the judiciary rather than the executive branch determines claims of sovereign immunity. 28 U.S.C. § 1602; H.R.Rept. No. 94–1487, 94th Cong. 2d Sess. 7, 14 *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 6604–6606, 6613.

defining the "United States" to include "all territory and waters, continental or insular, subject to the jurisdiction of the United States." Under Article 3 of the Trusteeship Agreement the Trust Territory is subject to the jurisdiction of the United States.[6] For purposes of the Act, the Trust Territory is part of the United States rather than a foreign state. The Act thus underscores and supports the holding in *People of Saipan* that the Trust Territory is not a foreign country immune from federal court jurisdiction.

The Trust Territory's immunity claim stems from misplaced reliance upon judicial construction of the term "foreign country" as used in a statute that has no relation to the question of foreign sovereign immunity. *Callas v. U. S.*, 253 F.2d 838, 840 (2d Cir. 1958), *cert. denied* 357 U.S. 936, 78 S.Ct. 1384, 2 L.Ed.2d 1550 (1958), decided that Kwajalein is a "foreign country" within the Federal Tort Claim Act's exclusion of causes arising in foreign countries.[7] *Brunell v. U. S.*, 77 F.Supp. 68, 72 (S.D.N.Y. 1948) held similarly as to Saipan.[8] Both courts in *People of Saipan* pointed out, and we agree, that *Callas* and *Brunell* were limited to the scope of the Federal Tort Claims Act. 502 F.2d at 95, 356 F.Supp. at 656. As the United States Supreme Court has cautioned, the words "foreign country" have no definitive meaning outside the statutory context within which they are construed:

> The term "foreign country" is not a technical or artificial one, and the sense in which it is used in a statute must be determined by reference to the purpose of the legislation.
>
> *Burnet v. Chicago Portrait Co.*, 285 U.S. 1, 5–6, 52 S.Ct. 275, 277, 76 L.Ed. 587, (1932).

*Accord, Mt. Washington Tanker Co. v. U. S.*, 505 F.Supp. 209, 213–215 (C.I.T. 1980).

*Mariana Islands Airport Authority v. Trust Territory*, Civil No. 78–002 (D.N.M.I., October 5, 1978) is a memorandum decision which neither party cites but which must be discussed to properly adjudicate this appeal and to avoid future confusion. At pages two and three of that decision the District Court indicated that one of the bases of its jurisdiction over the Trust Territory was 28 U.S.C. § 1605(a)(2). That statute is the Foreign Sovereign Immunities Act's exception for foreign state commercial activities. Although the court correctly ruled that it had jurisdiction, the rationale behind its holding was erroneous. The court had jurisdiction because, as *People of Saipan* decided, the Trust Territory is not a jurisdictionally immune foreign state. Since the Trust Territory is not jurisdictionally immune as a general rule, it was unnecessary to ground jurisdiction upon an exception to foreign sovereign immunity. *Mariana Islands Airport Authority* is overruled to the extent that it suggests that it is necessary to predicate jurisdiction over the Trust Territory upon an exception to foreign sovereign immunity. The other rulings in the case remain unaffected.

**B.** *Effect of Covenant § 402(b) and 48 U.S.C. § 1694a(b)*

In 1970 the now-defunct Congress of Micronesia passed 6 T.T.C. § 251(1)(a). That statute grants the Trial Division of the High Court exclusive jurisdiction over tax refund actions. The United States Congress subsequently approved Covenant § 402(b) and enacted 48 U.S.C. § 1694a(b). Those statutes give jurisdiction to the United States District Court for the Northern Mariana Islands over *all* causes: (1) which

---

**6.** Trusteeship Agreement for the Former Japanese Mandated Islands, July 18, 1947, Art. 3, 61 Stat. 3301, T.I.A.S. No. 1665.

**7.** 28 U.S.C. § 2680(k).

**8.** *Brunell* may not have survived the implementation of the Covenant. Section 502(a)(2) of the Covenant states that, unless otherwise provided in the Covenant, laws applicable to Guam and to the fifty states apply to the Northern

Mariana Islands. On January 9, 1978, § 502(a)(2) took effect pursuant to the presidential proclamation procedure outlined in § 1003(b). The Federal Tort Claims Act applies within the fifty states. *Brandt v. U. S.*, 110 F.Supp. 627, 629 (D.Guam 1953) established that the Act is available to parties injured on Guam. The Act may now apply to the Northern Mariana Islands, but we do not decide that question here.

arise in the Northern Mariana Islands; (2) which do not arise under the Constitution, treaties, or laws of the United States; and (3) which Northern Marianas law does not commit to Northern Marianas courts (local law actions).[9] The issue is whether this Court has jurisdiction over a § 251(1)(a) refund suit as a local law action under § 402(b) and § 1694a(b). We decide that it has.

Under 48 U.S.C. § 1681(a), the United States Congress has ultimate authority over Trust Territory governance. Congressional approval of § 402(b) and § 1694a(b) was an exercise of that authority which put an end to the High Court's exclusive jurisdiction within the Northern Marianas over tax refund suits and other local law actions.

Title 48 U.S.C. § 1681(a) states:

*Until Congress shall further provide* for the government of the Trust Territory of the Pacific Islands, all executive, legislative, and judicial authority necessary for the civil administration of the Trust Territory shall continue to be vested in such person or persons and shall be exercised in such manner and through such agency or agencies as the President of the United States may direct or authorize. (emphasis added)

This language clearly enjoins that Congress has the final word on the government of the Trust Territory. It means that Congress may, either expressly or impliedly, modify or eliminate any Trust Territory governmental agency or power created by the President or by officials acting under presidential delegation. This plenary congressional authority flows from Articles 3 and 12 of the Trusteeship Agreement. Under Article 3 the United States possesses full legislative power over the Trust Territory.[10] Article 12 empowers the United States to implement the agreement. *People of Saipan*, 502 F.2d at 98 n. 10.

The Congress of Micronesia enacted § 251(1)(a) pursuant to legislative authority conferred by the Secretary of Interior.[11] The Secretary of Interior acted under delegation from the President.[12] As a creation of delegated power emanating from the United States Congress, the High Court's jurisdiction was exclusive in the Northern Marianas only until Congress provided otherwise. Congress did exactly that when it approved Covenant § 402(b) and 48 U.S.C. § 1694a(b).

The operation of Covenant § 1003(b) supports this conclusion. Pursuant to § 1003(b), federal court jurisdiction under § 402(b), as well as other provisions of the Covenant, became effective well before termination of the Trusteeship.[13] That fact reflects the importance attached by both Congress and the people of the Northern Marianas to the immediate reconstitution of judicial authority. If Congress had intended to leave the High Court's jurisdiction undisturbed, it logically would have delayed the inception of federal court jurisdiction until after the Trusteeship ended.

---

9. Note 3, *supra*.

10. Citing Article 3, the High Court itself has recognized that, by operation of the Trusteeship Agreement, Congress is the source of Trust Territory governmental power. *See Calvo v. Trust Territory*, 4 T.T.R. 506, 511 (H.C. App.Div.1969).

11. Department of Interior Secretarial Order No. 2918, Part III, 34 Fed.Reg. 169, December 27, 1968.

12. Executive Order No. 11021, 27 Fed.Reg. 4409, May 8, 1962.

13. The legislative history of § 1003(b) demonstrates that the purpose of the section was to ensure that the rights and the basic reallocation of governmental power mandated by the Covenant would come into being even if the Trusteeship continued longer than anticipated.

> . . . (T)he provisions of the Covenant which come into effect in accordance with section 1003(b) can come into effect whether or not the Trusteeship has been terminated. This assures the Marianas people of as many of the benefits of the new political status as possible, and protects them in the event that the Trusteeship is not promptly terminated for reasons which are outside of their control.

Marianas Political Status Commission Memorandum, comment on § 1003(b) *reprinted in* H. Marcuse, *Covenant To Establish A Commonwealth Of The Northern Mariana Islands: Basic Document And Annotations* p. 119 (U.S. Department of Justice. September 1976).

Executive branch implementation of the Covenant prior to the effectuation of § 1003(b) underscored that the High Court's exclusive jurisdiction was living on borrowed time. Six days after the Covenant became law, Department of Interior Secretarial Order No. 2989 took effect on April 1, 1976. Under Part XII of the Order, the High Court retained judicial authority in the Northern Marianas only until the establishment of a judiciary pursuant to the Covenant. Part XIV provided that the Order's effect would terminate upon issuance of the presidential proclamation setting § 1003(b) into motion. The Order thus acknowledged what Congress had already mandated. Once § 1003(b) brought § 402(b) into effect, the federal district court had jurisdiction over *all* causes defined in § 402(b).[14]

The Trust Territory argues without citation that it possesses "sovereignty"[15] which protects the High Court from the clear language and effect of § 402(b) and § 1694a(b). We reject this unsupported claim.

Sovereignty traditionally connotes supreme, independent, and absolute political authority. *See, e. g., Brandes v. Mitterling,* 67 Ariz. 349, 196 P.2d 464, 467 (Ariz.1948); 1 L. *Oppenheim International Law* §§ 64, 65, 118–119 (8th ed. H. Lauterpacht 1955). Yet, Justice Frankfurter observed that "the very concept of sovereignty is in a state of

more or less solution these days." *U.S. v. Spelar,* 338 U.S. 217, 223, 94 L.Ed. 3, 70 S.Ct. 10, 13 (1949) (concurring). Scholarly commentary also expresses the view that sovereignty is an elusive term of art rather than a legal expression capable of precise definition. *See* Note, "Macrostudy of Micronesia: The Ending of A Trusteeship," 1972 *N.Y.L.F.* 139, 205–207 (1972). Whatever sovereignty is, prior decisions leave no doubt that it is something to which the Trust Territory's inchoate legal status and authority do not amount. That status and authority do not afford a shield against congressional legislation in general nor against the Covenant in particular.

■ At most the Trust Territory has "quasi-sovereignty,"[16] which courts also describe interchangeably, more frequently, and more precisely as "qualified sovereignty."[17] This qualified sovereignty is the right to exercise local governmental authority delegated by the United States Congress pursuant to its legislative powers under the Trusteeship Agreement. *People of Saipan,* 356 F.Supp. at 658–659; *Calvo v. Trust Territory,* 4 T.T.R. 506, 511–512 (H.C.App. Div.1969). It is limited sovereignty which is similar but not identical to that of a state government.[18] *See People of Saipan,* 356 F.Supp. at 658. To an even greater degree

14. The presence here of a clear jurisdictional grant from Congress to the deciding court distinguishes this case from *R.C.A. Global Communications v. U.S. Department of Interior,* 432 F.Supp. 791 (D.Guam 1977). In *R.C.A.* the court held that it lacked jurisdiction over the Trust Territory for acts committed in the Northern Marianas. *Id.* at 794. Congress had not empowered that court, as it has this Court, to decide causes arising in the Northern Mariana Islands.

15. Appellant's Opening Brief, 17–18.

16. *McComish v. C.I.R.,* 580 F.2d 1323, 1330 (9th Cir. 1978). "Quasi-sovereignty" is congressionally delegated local governmental authority similar to that possessed by state governments. *People of Puerto Rico v. Shell Oil Co.,* 302 U.S. 253, 261–262, 58 S.Ct. 167, 171, 82 L.Ed. 235 (1937). It is the same degree of governmental authority signified by the phrase "qualified sovereignty."

17. *People of Saipan v. U.S. Department of Interior,* 356 F.Supp. 645, 659 (D.Haw.1973), *aff'd*

as modified on other grounds 502 F.2d 90 (9th Cir. 1974), *cert. denied* 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975); *Calvo v. Trust Territory,* 4 T.T.R. 506, 512 (H.C.App.Div.1969); *Alig v. Trust Territory,* 3 T.T.R. 603, 615 (H.C. App.Div.1967).

18. The Trust Territory's qualified sovereignty lacks the constitutional protection and autonomy of state government sovereignty. Under the Tenth Amendment to the United States Constitution, the states and the people retain all powers which the Constitution neither delegates to the federal government nor prohibits to the states. This recognizes that "the government of a state does not derive its authority from the United States." *Grafton v. U.S.,* 206 U.S. 333, 354–355, 27 S.Ct. 749, 755, 51 L.Ed. 1084 (1907); *accord National League of Cities v. Usery,* 426 U.S. 833, 844, 96 S.Ct. 2465, 2470–2471, 49 L.Ed.2d 245 (1976). By contrast the Trust Territory government does.

than state government authority, it yields to the will of Congress.

That is the meaning and effect of 48 U.S.C. § 1681(a). As *People of Saipan* declared, qualified sovereignty does not provide immunity from congressional enactments; those enactments supercede and limit Trust Territory law. *Id.* at 659. Here the superceding legislation consists of Covenant § 402(b) and 48 U.S.C. § 1694a(b). It displaces the High Court's exclusive jurisdiction in the Northern Marianas over local law actions.

In certain administrative and governmental roles the Trust Territory is a distinct legal entity. Nevertheless it is not in every substantial sense an independent international entity. *W.C.C. v. M.T.C.*, 456 F.Supp. 1122, 1124 (D.Haw.1978). In the final analysis it is "merely a name under which the United States carries out its obligations as Administering Authority under the Trusteeship Agreement." *Alig v. Trust Territory*, 3 T.T.R. 64, 67 (H.C.Tr.Div.1965), aff'd. 3 T.T.R. 603, 612 (H.C.App.Div.1967). Qualified sovereignty serves only to facilitate the fulfillment of those obligations. It does not exempt the Trust Territory from either the letter or the manifest purpose of the Covenant or of any other statute enacted by Congress.

## II.

## TAX REFUND

We now address the merits. The question presented is whether, in this action under 6 T.T.C. § 251(1)(a), Sablan may recover wrongfully assessed taxes which it paid without protest.[19]

The Trust Territory's position is Sablan may not obtain a refund. It bases that conclusion upon what it characterizes as the "well-settled"[20] rule that in the absence of an enabling statute taxpayers cannot recover taxes paid without protest. This argument does not withstand close examination.

### A. Construction of § 251(1)(a)

■ By its very terms the principle invoked by the Trust Territory is inapplicable where, as here, a statute authorizes refund actions. Under such circumstances, a taxpayer protest is a prerequisite only if the statute so provides. *See State v. Wakefield*, 495 P.2d 166, 172 (Alas.1972); *Brandt v. Riley*, 139 Cal.App. 250, 33 P.2d 845, 846–847 (Cal.App.1934). Because the statute displaces the common law, it alone determines the conditions or prerequisites which must be satisfied. *Lovelace Center for Health Services v. Beach*, 93 N.M. 793, 606 P.2d 203, 206 (N.M.App.1980); *Atkinson v. State*, 66 Wash.2d 570, 403 P.2d 880, 883 (1965); *see Omnibus Fin. Corp. v. U.S.*, 566 F.2d 1097, 1101–1102 (9th Cir. 1977); *Transamerica Title Ins. Co. v. Hoppe*, 26 Wash. App. 149, 611 P.2d 1361, 1364–1365 (Wash. App.1980).

Accordingly we look solely to the language of § 251(1)(a), to ascertain whether a protest is necessary. This analytical approach harmonizes with Trust Territory law. Under 1 T.T.C. § 103, common law applies only "in the absence of" statute.

■ Section 251(1)(a) does not impose a protest requirement. It broadly sanctions refund actions to recover "any" erroneously or illegally collected taxes.[21] Where, as here, there is no contrary legislative history, the word "any" in a statute means precisely what it says. *See Harrison v. PPG Indus-*

19. Sablan paid the taxes because it erroneously believed that it was liable for them under 77 T.T.C. § 53. On a different record we would then determine an additional question: whether recovery is foreclosed by the fact that Sablan paid under a mistake of law. Since the Trust Territory did not raise the mistake of law issue below, the issue is not before us. Except for compelling reasons not present here, appellate courts do not decide issues raised for the first time on appeal. *Guam v. Okada*, 642 F.2d

287, 289 n. 6 (9th Cir. 1981). We note, however, that the rationale underlying the analysis of the protest issue seems to extend to the mistake of law question. Under that rationale, payment under a mistake of law does not preclude recovery since § 251(1)(a) fails to expressly so provide.

20. Appellant's Opening Brief 4.

21. Note 1, *supra.*

*tries Inc.*, 446 U.S. 578, 589, 100 S.Ct. 1889, 1896, 64 L.Ed.2d 525 (1980). The language of § 251(1)(a) does not preclude recovery by those who, without protest and in good faith, voluntarily pay wrongfully assessed taxes. This Court will not engraft such an unconscionable limitation into the statute.

█ That decision honors the principle that legislation authorizing tax refund suits is to be liberally construed in favor of taxpayers. *Bonwit Teller & Co. v. United States*, 283 U.S. 258, 263, 75 L.Ed. 1018, 51 S.Ct. 395, 397 (1931); *accord Hollander v. U.S.*, 248 F.2d 247, 251 (2d Cir. 1957). *See generally* 1 *Mertens Law of Federal Income Taxation* § 3.09; 3 *Sutherland Statutory Construction* § 66.07 (4th ed. 1973). It also enforces the sound policy that "taxation need not and should not remain a mystery, or worse, a trap." *Kocurek v. U.S.*, 628 F.2d 906, 915 (5th Cir. 1980) (concurring).

### B. *Modern Common Law*

The cases urged by the Trust Territory would not control even if common law rather than legislation governed this case. It is no longer "well-settled" that voluntary tax payments without protest cannot be recovered. That harsh doctrine is a nineteenth century relic that has lost its authority in the face of contemporary decisions:

> . . . courts are now taking a more liberal view as to whether certain types of taxes are ever in fact voluntarily paid since the urgent and immediate payment of them is compelled in order to avoid the harsh penalties imposed for nonpayment. The compulsion brought about by such penalties creates . . . implied duress sufficient to make the payment of such taxes involuntary. We adopted the modern view . . . (citation omitted) (and) declined to follow the stricter view of some of our earlier decisions.[22]

*Kresge Co. v. Howard*, 357 Mo. 302, 208 S.W.2d 247, 250 (Mo.1947), *cited in Manufacturers' Cas. Ins. Co. v. Kansas City*, 330 S.W.2d 263, 80 A.L.R.2d 1035, 1039 (Mo.App.1959).

*Accord, State v. Wakefield*, 495 P.2d at 172; *see Stratton v. St. Louis Southwestern Ry. Co.*, 284 U.S. 530, 532–533, 52 S.Ct. 222, 223, 76 L.Ed. 465 (1932); *U.S. v. Halton Tractor Co.*, 258 F.2d 612, 616 (9th Cir. 1958); *Panitz v. District of Columbia*, 112 F.2d 39, 41–42 (D.C.Cir.1940). *See generally* 80 A.L. R.2d 1035, 1043 § 3(a).

█ It is unimportant that some ancient cases have not been specifically repudiated. The precedential force of older authority may be as effectively dissipated by a later trend of decision as by a statement expressly overruling it. *Sei Fujii v. State of California*, 38 Cal.2d 718, 728, 242 P.2d 617, 624 (Cal.1952); *see Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 361–365, 35 L.Ed.2d 351, 93 S.Ct. 1001, 1004–1006 (1973).

We discuss the common law both to clarify the state of the law and to frame a more serious issue. That issue is the inartful research reflected in the Trust Territory's opening brief.

█ Appellate counsel have the duty to be scrupulously accurate when citing authority in their briefs and oral arguments. *Frausto v. Legal Aid Society of San Diego*, 563 F.2d 1324, 1327 n. 8 (9th Cir. 1977). The obligation to cite controlling authority is part of that duty. *Vargas v. McNamara*, 608 F.2d 15, 19 (1st Cir. 1979). These are the rules of law as much as gestures of courtesy to the court.

The Trust Territory repeatedly breaches them in the section of its brief dealing with the merits. A disapproved case is cited as if it is still good law.[23] Other decisions are cited for propositions for which they clearly do not stand.[24] Most unsettling of all,

---

**22.** In *Kresge* the Missouri Supreme Court reaffirmed its previous rejection of the view barring the recovery of taxes voluntarily paid without protest. As an example of the line of cases disapproved by its adoption of the modern rule, it pointedly named *Couch v. Kansas City*, 127 Mo. 436, 30 S.W. 117 (1895). In its

opening brief at 10–11, the Trust Territory cites *Couch* to us.

**23.** *Couch v. Kansas City*, note 22, *supra.*

**24.** One example is *Union Bag & Paper Co. v. State*, 160 Wash. 538, 295 P. 748 (1931). On page four of its brief the Trust Territory cites

much of the discussion of the merits is taken verbatim from a secondary source without citation or attribution.[25] These practices are unacceptable.

The Court understands that attorneys, like all human beings, can make mistakes. With that thought in mind it issues reprovals only after careful and searching deliberation. At the same time as a federal district court it has a responsibility to supervise practice by members of its bar. *Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir. 1975). Given the flagrance and the extent of the Trust Territory's neglect here, faithfulness to that responsibility has compelled it to speak out.

The judgment is AFFIRMED.

the case as primary support for its argument that taxes paid without protest cannot be recovered in the absence of an enabling statute. *Union Bag* did not so rule. In fact, it disproves the Trust Territory's contention. Notwithstanding the absence of an authorizing statute, the case held that a corporation *could* recover illegally imposed license fees paid without protest. *Id.* at 749–751. The decision thus comports with the modern common law rule. The context of this citation within the brief strongly suggests that the Trust Territory relied upon a synopsis of *Union Bag* in the American Law Reports encyclopedia. That possibility moves us to point out that the mechanical citation of secondary sources is no substitute for the independent analysis of court decisions. *See, e. g.,*

Peters "A Judge's View of Appellate Advocacy," *California Appellate Practice, cited in* Merryman, "Toward a Theory of Citations: An Empirical Study of the Citation Practice of the California Supreme Court in 1950, 1960, and 1970," 50 *S.Cal.L.Rev.* 381, 405–406 n. 17 (1977).

25. From the citations at the bottom of page six through the first full paragraph on page eleven, most of the text is taken verbatim without citation from 48 A.L.R. 1378, 1382–1385. The one short section within those pages which is both cited and attributed with quotation marks is miscited on page six as 43 A.L.R. 415.