36

FILED
Clerk
District Court

FEB 04 1985

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN MARIANA ISLANDS

For The Northern Mariana Islands
By_____
(Deputy Clerk)

EDWARD TEMENGIL, et.al.,           )        CIVIL NO. 81-0006
                                   )
                Plaintiffs,        )
                                   )
            vs.                    )            DECISION
                                   )
TRUST TERRITORY OF THE PACIFIC·    )
ISLANDS, JANET McCOY, High         )
Commissioner of the Trust          )
Territory of the Pacific           )
Islands, UNITED STATES DEPART-     )
MENT OF THE INTERIOR, WILLIAM      )
P. CLARK, JR.*, Secretary of       )
the Interior, UNITED STATES OF     )
AMERICA,                           )
                                   )
                Defendants.        )
_____)

The instant motions represent yet another series of pretrial skirmishes in the employment discrimination class action filed by current and former employees of the Trust Territory of the Pacific Islands Government (hereinafter Trust Territory). The background of the case is fully set forth in the Court's prior decision filed March 22, 1983, Temengil v. Trust Territory of the Pacific Islands, et. al., Civ. No. 81-0006 (D.N.M.I. 1983) (hereinafter "Temengil I") and need not be repeated here. The Trust Territory presently moves to: 1) dismiss the claims for

---

*Pursuant to Federal Rule of Civil Procedure 25(d)(1), the Court has substituted Secretary of the Interior William P. Clark, Jr. in place of the original defendant official.

monetary damages; 2) strike the demand for punitive damages; and 3) strike the demand for jury trial. For the reasons stated below, the Court grants the motions to strike the jury demand and to strike the claim for punitive damages and denies the motion to dismiss the monetary damages.

## I.   Motion to Dismiss

Plaintiffs initially raise a procedural challenge regarding the propriety of this motion under Rule 12(g) of the Federal Rules of Civil Procedure which reads:

> A party who makes a motion under this rule may join with it any other motions herein provided for and then available to him. If a party makes a- motion under this rule but omits therefrom any defense or objection then available to him which this rule permits to be raised by motion, he shall not thereafter make a motion based on the defense or objection so omitted, except a motion as provided in subdivision (h)(2) hereof on any of the grounds there stated.

Rule 12(h)(2) provides in relevant part:

> A defense of. failure to state a claim upon which relief can be granted... may be made in any pleading permitted or ordered under Rule 7(a), or by motion for judgment on the pleadings, or at the trial on the merits.

Under these sections, the plaintiffs argue that the Trust Territory's current 12(b)(6) motion should have been consolidated with its previous 12(b)(6) motion and the failure to so do bars the

current motion.

The Trust Territory's motion, though phrased as one under 12(b)(6), is more properly brought under 12(b)(1) to dismiss for lack of subject matter jurisdiction as it raises a defense of sovereign immunity. See 5 C. Wright and A. Miller, Federal Practice and Procedure § 1350 at 139 (1983 supp.)(hereafter "Wright and Miller"). See also Leonhard v. Mitchell, -73 F.2d 709, 712 (2nd Cir. 1973), cert. denied, 42 U.S. 949, 93 S.Ct. 3011, 37 L.Ed.2d 1002 (1973). Accordingly, the motion is treated as if brought pursuant to 12(b)(1). See Bauer v. McCoy, Civ.No. 81-0019 (D.N.M.I. Jan. 22, 1982) at 18-19. Rule 12(h)(3) provides:

> Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.

Thus, the defense of absence of subject matter jurisdiction is preserved against waiver. Fed.R.Civ.Pro. 12(h)(3) advisory committee note; Augustine v. United States, 704 F.2d 1074, 1077 (9th Cir. 1983). When a defendant by motion raises a question of subject matter jurisdiction in a manner otherwise untimely under Rule 12, courts will treat the motion as a "suggestion" of no jurisdiction permissible under Rule 12(h)(3). Kantor v. Comet Press Books, 187 F.Supp. 321, 322 (S.D.N.Y. 1960); 5 Wright and Miller § 1350 at 544-547.

What troubles plaintiffs here is not that the Trust Territory now brings a 12(b)(1) motion subsequent to earlier Rule

12 motions, but that the Trust Territory is renewing a subject matter challenge on grounds which could have been raised in the earlier motion. There is authority to support the proposition that such challenges may be renewed where it appears in the course of litigation that the court is without jurisdiction. See, e.g, Abdelnour v. Coggeshall & Hicks, 287 F.Supp. 135, 137 (S.D.N.Y. 1968). However, there is also case authority on 12(b)(6) motions, also unwaivable, that all supporting theories must be asserted in the first motion. See, e.g., Randolph Engineering v. Fredenhagen Kommandit, 476 F.Supp. 1355, 1358 (W.D.Penn. 1979)(the defendant should argue in the alternative in support of his or her motion as "the Federal Rules do not allow a party to delay a case by asserting its arguments seriatim"). The Court here is torn between the desire to promote judicial economy and prevent delay or dilatory tactics on the one hand and the need to address important issues on the other.

In a case such as this, the Court has broad discretion to consider the issue. A court has the "inherent power... to consider certain legal issues as required by the interests of justice despite the failure of the parties to preserve them in a timely fashion." Weaver v. Bowers, 657 F.2d 1356, 1361 (3rd Cir. 1981)(en banc), cert. denied, 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982). The purpose of the consolidation requirement is to avoid delay at the pleading stage. "Simply stated, the objective of the rule is to eliminate unnecessary delay.... [A party] cannot delay the filing of a responsive pleading by inter-

40

posing... defenses and objections in a piecemeal fashion." 5 Wright and Miller § 1384 at 837. See also Fed.R.Civ.Proc. 12(g) advisory committee notes (rule intended to avoid "piecemeal consideration of a case"). Courts in the past have shown reluctance to dispose of significant issues on the basis of procedural delinquencies. See, e.g. Printing Plate Supply Co. v. Curtis Publishing Co., 278 F.Supp. 642, 645 (E.D.Penn. 1968). "This is particularly the case when the... tardiness has caused... no prejudice, and when the merits of the... motion have been fully argued." Id.

The potential delay here has already occurred. The plaintiffs raised their objection to the motion at the hearing, eleven weeks after the motion was filed. As that matter was taken under advisement, the merits of the motion have now been fully briefed and argued. The court's decision now to address the merits of the motion will result only in minimal additional delay. In addition the timing of the motion has minimized the resultant delay. The parties are conducting discovery under a court approved timetable developed before the filing of the motion and appear to be adhering to the schedule in good faith. Thus, although the motion has undoubtedly slowed somewhat the progress of the case, it has not altogether stopped the proceedings.

The Court is concerned and annoyed with the procedural decisions made by the Trust Territory in renewing this motion on grounds available at the time of the previous motion and warns

41

that such practices are greatly discouraged and will not be tolerated in the future. However, under the circumstances of this case and in the interests of expedience and justice, the Court will address the Trust Territory's renewed motion.

The Trust Territory's motion to dismiss rests essentially on three grounds. First, the Trust Territory argues that as a territorial government, it possesses a common law sovereign immunity which shields it from unconsented suits for monetary damages. Alternatively, the Trust Territory argues that the Eleventh Amendment to the United States Constitution prevents the federal judiciary from deciding actions against the Trust Territory. Lastly, it is argued that even should this Court have jurisdiction over the Trust Territory on the asserted claims, any judgment cannot include monetary relief as such a judgment would necessarily be paid out of the United States Treasury and is accordingly barred by the sovereign immunity of the United States.

A. Common Law Immunity

The Trust Territory argues that it possesses an immunity from suit as an inherent attribute of its governmental status. This position is supported essentially by analogy. The Trust Territory directs the Court's attention to decisions of territorial courts which have recognized the sovereign immunity of such possessions and territories as Puerto Rico, the Virgin Islands and Guam. It follows, according to the argument, that the Trust Territory as well possesses some inherent immunity.

AO 72
(Rev.8/82)

42

■ The Trust Territory's position is significantly weakened by its failure to discuss prior statements by this Court and by the Ninth Circuit regarding the nature and status of the Trust Territory Government. As an initial matter, this Court has not recognized in the Government of the Trust Territory a sovereign status which approaches that possessed by a state of the union. "Whatever sovereignty is, prior decisions leave no doubt that it is something to which the Trust Territory's inchoate legal status and authority do not amount." Sablan Construction Co. v. Government of the Trust Territory of the Pacific Islands, 526 F.Supp. 135, 140 (D.N.M.I.(App.Div.)1981). However, more important than the degree to which the Trust Territory can be considered sovereign is the relevance and effect of such attributes on this action.

■■ It is now settled that one government's claim of sovereign or governmental immunity need not be recognized by the courts of another government. In Nevada v. Hall, 440 U.S. 410, 99 S.Ct. 1182, 59 L.Ed.2d 416 (1979), the Supreme Court held that the State of Nevada could not claim immunity from an action by a California resident in a California court for tort damages. The Court, quoting Justice Holmes, found that the doctrine of sovereign immunity is founded "on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends." 99 S.Ct. at 1186, quoting Kawananakoa v. Polyblank, 205 U.S. 349, 353, 27 S.Ct. 526, 527, 51 L.Ed. 834 (1907). The Court concluded that "[t]his

AO 72
(Rev.8/82)

43

explanation adequately supports the conclusion that no sovereign may be sued in its own courts without its consent, but it affords no support for a claim of immunity in another sovereign's courts." 99 S.Ct. at 1186. Based on this, this Court has already concluded that Nevada v. Hall precludes the assertion of sovereign immunity defenses by the Trust Territory in this Court. The "Trust Territory government is a subordinate and administratively separate entity in relation to the United States government" and thus its claimed common law sovereign immunity does not extend into federal court. Temengil I at 36. See also Bauer v. McCoy, supra p.3, at 24 n.49. The Trust Territory's attempt to limit the rational of Nevada v. Hall to state courts is without foundation and unpersuasive.

Moreover, this Court has already held that a claimed governmental immunity cannot insulate the Trust Territory from violations of federal laws. Temengil I at 36. See also People of Saipan v. United States Department of the Interior, 356 F.Supp. 645, 658-659 (D.Haw. 1973), aff'd, 502 F.2d 90 (9th Cir. 1974), cert. denied, 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975). (Trust Territory's sovereign immunity "cannot be extended to include suits under a statute of the United States applicable in the Trust Territory. Such statutes confer rights which are not dependent on local authority--indeed, they supersede local law"). Specifically, this Court has found the Trust Territory subject to liability for violations of § 1983. "The Trust Territory government clearly is a "body politic" and

44

it does not possess any federal constitutional or statutory immunity from § 1983 claims. Therefore, under Monell's [Monell v. Department of Social Services of City of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)] rationale both the Trust Territory government and the High Commissioner must be considered to be "persons" against whom § 1983 actions may lie." Temengil I at 82. Accordingly, the Trust Territory's common law sovereign immunity claims are rejected.[1]

## B. Eleventh Amendment Immunity

The Trust Territory argues that the Eleventh Amendment to the United States Constitution prohibits the exercise of federal jurisdiction over plaintiffs' monetary claims. The Amendment reads:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

---

[1] The Trust Territory's position is also rejected on a procedural basis. Claims of sovereign immunity cease to be operative once the government has answered the complaint. Richardson v. Fajardo Sugar Co., 241 U.S. 44, 47, 36 S.Ct. 476, 477, 60 L.Ed. 879, 880 (1916). See also People of Porto Rico v. Ramos, 232 U.S. 627, 631, 34 S.Ct. 461, 462, 58 L.Ed. 763, 765 (1914) (immunity disappears where territorial attorney general petitioned to be added as a third-party defendant). The Trust Territory filed its answer on October 15, 1982.

AO 72
(Rev.8/82)

45

There has been considerable confusion regarding the nature and scope of the Eleventh Amendment since its ratification nearly 200 years ago. Article III of the United States Constitution defines the federal judicial power to extend to enumerated cases and controversies, among which are included "controversies between a State and Citizens of another State." In Chisolm v. Georgia, 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793), two citizens of South Carolina brought an action against the State of Georgia for alleged acts in contravention of the "contracts clause" of the United States Constitution. The Supreme Court, per Justice Marshall, held that Article III allowed the exercise of federal jurisdiction where a state was a defendant as well as where it was a plaintiff. The response of the states to the Chisolm decision was immediate and uniform: the federal judicial power was not to extend to cases where a State was made a defendant. See L. Tribe, American Constitutional Law at 130 (1977). Within five years, the Eleventh Amendment, embodying those sentiments, was passed by Congress and ratified by the States.

The Eleventh Amendment has not been accorded a strict or literal interpretation. Its effects extend well beyond the plain meaning of its language. Civil Actions Against State Government at 163 (Shepard's/McGraw-Hill 1982)). Thus, despite its language which appears to limit federal judicial power only where the action is commenced by citizens of another state or of a foreign state, the amendment has been read to preclude federal suits against states by citizens of the same state, Hans v. State

AO 72
(Rev.8/82)

of Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), by a foreign state, Principality of Monaco v. State of Mississippi, 292 U.S. 313, 54 S.Ct. 745, 78 L.Ed. 1282 (1934) and by federal corporations. Smith v. Reeves, 178 U.S. 436, 20 S.Ct. 919, 44 L.Ed. 1140 (1900).

The Trust Territory, in light of this historic trend of expansive interpretation, would have this Court read the Amendment to embody the "broader and more ancient doctrine of sovereign immunity." Trust Territory Memorandum in Support of Motions at 13 (hereinafter Trust Territory Memorandum). Reiterating its earlier arguments of inherent sovereign immunity, the Trust Territory suggests that the Eleventh Amendment be interpreted to protect the Trust Territory from suit in federal court. This strained reading proves too much.

The Eleventh Amendment embodies principles of sovereignty so far as that concept relates to the States and to the federal system created by the Constitution; however, Eleventh Amendment immunity and sovereign immunity remain separate, independent doctrines. See L. Wolcher, Sovereign Immunity and the Supremacy Clause: Damages Against States in Their Own Courts for Constitutional Violations, 69 Cal.L.Rev. 189, 236 (1981). In attempting to understand the Amendment, it is important to remember the historical evolution of the Union government. Originally, the States were viewed as independent sovereigns, each possessing attributes of sovereignty. W. Fletcher, A Historical Interpretation of the Eleventh Amendment: A Narrow

AO 72
(Rev.8/82)

Construction of an Affirmative Grant of Jurisdiction Rather than a Prohibition Against Jurisdiction, 35 Stan.L.Rev. 1033, 1065 (1983). In fact, so firm was this belief that some states went so far as to conduct their own foreign affairs. Fletcher, supra, at 1068 note 156. When the Constitution was adopted, a new political entity had been created. The new union was vested with the attributes of a sovereign for many purposes such as the conduct of war and foreign relations, the regulation of commerce among the states and the maintenance of a national treasury. Necessarily, this sovereignty was derived from that which previously had been attributed to the states. Whether one views the constitutional process as the voluntary relinquishment by the states of certain aspects of their sovereignty or an act by the people revoking grants of power originally given the States and then vesting the same in the federal government, the result is the same: the federal government possessed attributes of sovereignty which had previously belonged to the States. See Tribe, supra p.10, at 130-131 (states surrendered sovereignty to a limited but certain extent); Fletcher, supra p.11, at 1065-1069 (people revoked authority given to the states and conferred same on the federal government).

In Article III, then, the sovereign immunity enjoyed by the States was diminished to the enumerated extent. The notes of the Constitutional Convention, see Hans v. Louisiana, 10 S.Ct. at 506, and the reaction to Chisolm make it fairly clear that the states and the people did not intend Article III to give the

AO 72
(Rev.8/82)

48

federal courts jurisdiction over the states as defendants. "Eleventh Amendment jurisprudence has left no doubt that the amendment not only reversed Chisolm, but also countermanded any judicial inclination to interpret Article III as a self-executing abrogation of state immunity from suit, thereby reinstating the original understanding that the states surrendered sovereign immunity only to the extent inherent 'in the acceptance of the constitutional plan.'" Tribe, supra p.10, at 130-131, quoting Monaco v. Mississippi, 54 S.Ct. at 751. Thus, the Eleventh Amendment simply reaffirmed the principles of the federal system and the integrity of state sovereignty. "It is therefore not surprising that the Supreme Court... has focused not on the language of the Eleventh Amendment, but on the concept of sovereign immunity of which it is a reminder." Tribe, at 131.

The Supreme Court, in its discussions of sovereign immunity under the Eleventh Amendment has limited its decisions to that sovereignty maintained by the States under the federal system. See, e.g., Hans v. Louisiana, 10 S.Ct. at 506-507 (the Court looked behind the Amendment to the Constitutional Convention debates for illumination of the principles supporting federal judicial power over the states). In Monaco v. Mississippi, Chief Justice Hughes wrote that behind the Amendment "are postulates which limit and control." 54 S.Ct. at 748. The Trust Territory reads this language to encompass all forms of sovereign immunity. However, the opinion was not so broad, but limited itself to the sovereignty enjoyed by the States. "There is also

AO 72
(Rev.8/82)

the postulate that States of the Union, still possessing attributes of sovereignty, [footnote omitted] shall be immune from suits, without their consent, save where there has been 'a surrender of this immunity in the plan of the convention.'" Id., quoting The Federalist No. 81. Most recently, in Pennhurst State School and Hospital v. Halderman, ___ U.S. ___, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), a case also cited by the movants in support of their liberal reading of the Eleventh Amendment, the Supreme Court reiterated its previous pronouncements that discussions of sovereignty and immunity as they relate to the Eleventh Amendment are necessarily restricted to the States. "Our reluctance to infer that a State's immunity from suit in federal court has been negated stems from recognition of the vital role of sovereign immunity in our federal system." 104 S.Ct. at 907. "Accordingly," the Court concluded, "in deciding this case we must be guided by '[t]he principles of federalism that inform Eleventh Amendment doctrine.'" 104 S.Ct. at 908, quoting Hutto v. Finney, 437 U.S. 678, 691, 98 S.Ct. 2565, 2573-2574, 57 L.Ed.2d 522 (1978) (emphasis added).

It is clear then, that, contrary to the assertions of the Trust Territory, Eleventh Amendment doctrine is not triggered every time a political body summoned into federal court claims sovereignty and its accompanying immunity. Rather, the Supreme Court has consistently looked to the "principles of federalism" behind the constitutional system of government. The Court has refused to extend, for example, eleventh amendment protection to

50

political subdivisions of a state. Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). And in the most recent case presenting an opportunity to extend Eleventh Amendment immunity beyond bona fide states, the Supreme Court refused, rejecting the petitioners' "expansive reading of the Amendment." Lake Country Estates v. Tahoe Regional Planning Agency, 440 U.S. 391, 400, 99 S.Ct. 1171, 1177, 59 L.Ed.2d 401, 410, (1979). "By its terms," Justice Stevens concluded for the majority, "the protection afforded by that Amendment is only available to 'one of the several States.'" Id.

In conclusion, even should the Trust Territory possess immunity in its own courts attributable to some degree of sovereignty, such immunity does not extend into this Court by way of the Eleventh Amendment.[2/]

There exists as well another basis which independently supports today's decision rejecting the Trust Territory's Eleventh Amendment claims. This Court has held previously that as the drafters of the Covenant omitted the Eleventh Amendment from Section 501, the terms of the Amendment are of no force and

[2/] This conclusion comports with that reached by the Appellate Division in Sablan Construction in which Judge Soll stated that "[t]he Trust Territory's qualified sovereignty lacks the constitutional protection and autonomy of state government sovereignty." 526 F.Supp. at 140 n.18. See also Meaamaile v. American Samoa, 550 F.Supp 1227, 1231 n.5 (D.Haw 1982)("the Eleventh Amendment... protects only states, not territories").

AO 72
(Rev.8/82)

51

effect in the Commonwealth. Thus, the Commonwealth of the Northern Mariana Islands is unable to challenge the court's jurisdiction based on the Amendment. Island Aviation, Inc. v. Mariana Islands Airport Authority, Civ.No. 81-0069 (D.N.M.I. Memorandum Opinion filed May 26, 1983). Likewise, a State of the Union is similarly prevented from successfully asserting the Eleventh Amendment as a jurisdictional bar in this Court. Kumagai v. Commonwealth of the Northern Mariana Islands, et. al, Civ.No. 81-0039 (D.N.M.I. Memorandum Opinion filed July 8, 1983)(State of Hawaii's motion to dismiss based on Eleventh Amendment denied). It follows under the reasoning of these decisions that similar arguments advanced by the Trust Territory must be rejected.

### C. Monetary Damages

#### 1. Character of Trust Territory Funds

The Trust Territory also attempts to raise as a bar to plaintiffs' claims for monetary damages the sovereign immunity of the United States. The Trust Territory argues that a significant damage award against the Trust Territory Government would require a supplemental request for funds from the United States, and would thus have a "direct effect on the federal treasury." Trust Territory Memorandum at 20. Such an impact on the federal treasury, the Trust Territory concludes, renders the action one against the United States which is barred by absence of consent.

52

The "effects test" is considered a corollary to the doctrine of sovereign immunity. A court has no jurisdiction if the judgment sought would expend itself on the public treasury or interfere with public administration. Land v. Dollar, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963). In addressing this issue, the court should look not to the heading on the complaint, but to the entity against whom relief is actually sought. Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). The Trust Territory argues that since "virtually all of [its] funding consists of direct United States appropriations and obligated grant funds" any judgment in this matter would necessarily need be satisfied out of federal funds depriving this Court of jurisdiction to adjudicate plaintiffs' monetary claims. Trust Territory Memorandum at 19-20.

The Trust Territory's analysis is oversimplified. The mere fact that an agency's funds were originally derived from the federal treasury is not conclusive. Where there are funds within the "possession and control" of the agency out of which a judgment can be satisfied the suit is against the federal defendant, and not the United States. Marcus Garvey Square, Inc. v. Winston Burnett Construction Co., 595 F.2d 1126, 1131 (9th Cir. 1979); S.S. Silberblatt, Inc. v. East Harlem Pilot Black, 608 F.2d 28, 36 (2nd Cir. 1979). See also Manufacturers National Bank of Detroit v. Brownstown Square Apartments, 491 F.Supp 206, 210 (E.D.Mich. 1980). In other words, an action against a federally

AO 72
(Rev.8/82)

funded entity is not barred by sovereign immunity where the entity's monies are "severed from Treasury funds and Treasury control." Industrial Indemnity Inc. v. Landrieu, 615 F.2d 644, 646 (5th Cir. 1980).

On this issue, additional guidance is found in the decisions of the Supreme Court regarding the tax immunity doctrine. That doctrine developed in response to attempts by the states to tax the operations of the federal government. The purpose of the doctrine is to avoid "clashing sovereignty" by preventing the States from imposing tax liability directly on the federal government. McCulloch v. State of Maryland, 4 Wheat. 316, 430, 4 L.Ed. 579 (1819). As with the "effects test" doctrine, questions have arisen in the tax immunity cases as to the propriety of taxing federal agents or contractors. The central question under each doctrine is the same: under what circumstances can it reasonably be said that the financial burden impermissibly falls on the federal government? Under the tax cases, "immunity may not be conferred simply because the tax has an effect on the United States, or even because the Federal Government shoulders the entire economic burden of the levy." United States v. New Mexico, 455 U.S. 720, 734, 102 S.Ct. 1373, 1382, 71 L.Ed.2d 580, 591 (1982). Thus, it is "constitutionally irrelevant" that the federal government reimburses in full a federal contractor for expenditures which include monies paid to cover a state imposed tax. Id. The Court in New Mexico went on to conclude that "tax immunity is appropriate in only one circum-

AO 72
(Rev.8/82)

stance: when the levy falls on the United States itself, or on an agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities." 102 S.Ct. at 1383. See also, e.g., South Carolina v. Regan, ___ U.S. ___, ___, 104 S.Ct. 1107, 1133 n.11, 79 L.Ed.2d 372, 404 n.11 (1984) (Stevens, J., concurring in part and dissenting in part)(collecting cases where immunity is found only where government entity itself is legally obligated to bear the costs of the tax). See generally L. Tribe, Intergovernmental Immunities in Litigation, Taxation and, Regulation: Separation of Powers Issues in Controversies About Federalism, 89 Harv.L.Rev. 682, 703-709 (1976).

The Trust Territory·cannot be considered an agency or instrumentality "so closely connected" to the United States that it cannot be viewed as a separate entity. The Trust Territory government "is a subordinate and administratively separate entity in relation to the United States Government." Temengil I at 36. The Trust Territory itself concedes that "the Trust Territory Government and the United States Government are legally separate and distinct." Trust Territory Memorandum at 21. Thus, the critical query in the immunity analysis must focus on whether or not the funds of the Trust Territory are sufficiently within its "possession and control" so as to be subject to a judgment levy.

The Trust Territory makes much of the fact that all of its funds trace their source to the federal treasury. However, as discussed above, the original source of the funds is not

AO 72
(Rev.8/82)

relevant, the physical possession and control is. As this Court noted in its previous decision in this case, in the opinion of the Trust Territory Attorney General, it is a "well-known rule" that "funds appropriated to the Department of the Interior as grants to the Trust Territory lose their character as federal funds when paid over and mingled with Trust Territory Government local revenues." Trust Territory Attorney General's Opinion 67-2 (Nov. 1, 1967) at 3, cited in Temengil I at note 65. The opinion of the Trust Territory Attorney General comports with the pronouncements of the United States Comptroller General who, as early as 1957, expressed the opinion that federal treasury funds paid over to the Trust Territory Government "lose their character as public funds." United States Comptroller General's Opinion B-131569 (June 11, 1957). See also United States Comptroller General's Opinion B-173589 (Sept. 30, 1971)(applying "well-settled rule" that grant funds became the property of the transferee); United States Comptroller General's Opinion B-157179, 52 Com.Gen. 558 (1973)(grants paid over to the territories and comingled with local revenues lose their character as federal funds). Cf. United States v. Gibbs, 704 F.2d 464, 466 (9th Cir. 1983)(under federal embezzlement statute, 18 U.S.C. 641, when federal and non-federal funds have been comingled, the critical factor in determining federal character is supervision and control of funds). Accord United States v. Eden, 659 F.2d 1376, 1380 (9th Cir. 1981), cert. denied, 455 U.S. 949; 102 S.Ct. 1450, 71 L.Ed.2d 663 (1982); United States v. Johnson, ,596 F.2d 842,

846 (9th Cir. 1979).

For these reasons, the Court declines to adopt the Trust Territory's interpretation of the sovereign immunity doctrine and the accompanying "effects test." The grant funds made available to the Trust Territory by the United States have lost their character as federal funds upon transfer and are available to satisfy a judgment in this matter.[3]

2. Fiduciary Obligations of the United States

The Court also finds an alternative and equally compelling reason which supports its decision denying the motion to dismiss plaintiffs' monetary claims. It is now settled that the United States is liable in money damages for the breach of its fiduciary responsibilities. United States v. Mitchell ___ U.S. ___, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983)(Mitchell II). Such a breach is alleged by plaintiffs here, and if found, subjects to the United States to liability for the resulting damages. Sovereign immunity is not an issue as the judgment is not sought against the United States, but against its agent, over which this

_____

[3] While the Trust Territory complains that it has insufficient assets to satisfy a "major money judgment," the Interior Budget shows grants of $112.1 million in Fiscal Year 1984 and $96.1 million in Fiscal Year 1985, amounts well in excess of the demands made by plaintiffs. United States Department of the Interior, The Interior Budget in Brief: Fiscal Year 1985 Highlights (Feb. 1, 1984) at 10.

AO 72
(Rev.8/82)

Court has jurisdiction to award monetary relief. See Keifer & Keifer v. Reconstruction Finance Corp., 306 U.S. 381, 389, 59 S.Ct. 516, 517, 83 L.Ed. 784 (1939)("The government does not become the conduit of its immunity in suits against its agents or instrumentalities merely because they do its work"). See also, e.g., Sloan Shipyards Corp. v. United States Shipping Board Corp., 258 U.S. 549, 566-567, 42 S.Ct. 386, 388, 66 L.Ed. 762, 768 (1922)("[T]he general rule is that any person within the jurisdiction is always amenable to the law... An instrumentality of Government he might be... but the agent, because he is agent, does not cease to be answerable for his acts.")

Mitchell II, involving the United States' fiduciary duties to the American Indian, is an important case and of relevance to the peoples of Micronesia as it is the clearest decision to date regarding the liability of the United States for breaches of its fiduciary obligations. Both the trial and appellate divisions of this Court have recognized the similarities in the United States-Indian and United States-Micronesian relationships. See, e.g., People of Saipan v. Department of the Interior, supra p.8, 356 F.Supp. at 660 (the Micronesia Trusteeship is a trust relationship to which the Indian analogy is "apt"); Palacios v. Commonwealth of the Northern Mariana Islands, Civ.App.No. 81-9017 (D.N.M.I.(App.Div.) June 27, 1983) at 10 ("[t]he very purposes which engendered the judicially created Indian fiduciary doctrine apply a fortiori to the Micronesian-U.S. relationship").

The facts of Mitchell II center around the Indians of

AO 72
(Rev.8/82)

58

the Quinault reservation situated on the Washington coast. The Quinault and Quileute tribes have lived on the reservation since the 1860's. In 1905, the federal government began allotting parcels of the reservation in trust to individual members of the tribes under the General Allotment Act of 1887. By 1935, the entire reservation had been divided and allotted. The conifer forests, which cover the vast bulk of the reservation, had long been managed on behalf of the allottees by the Department of the Interior. The proceeds of all sales of timber are required by statute to be used for the benefit of the Indians or given directly to the Indian owner.

In 1971, several of the allottees filed suit against the United States for pervasive waste and mismanagement of the timber reserves in breach of their fiduciary obligations. The United States moved to dismiss arguing that the Court of Claims had no jurisdiction over claims based upon a breach of trust. The Supreme Court found initially that the General Allotment Act created only a "limited trust relationship" and did not impose upon the United States any obligation to manage timber resources. United States v. Mitchell, 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980)(Mitchell I). After a remand, the issue again was before the Supreme Court.

The Court quickly disposed of the sovereign immunity argument finding that the Tucker Act, 28 U.S.C. § 1491, and its counterpart for Indian claims, 28 U.S.C. § 1505, "supplies a waiver of immunity." Mitchell II, 102 S.Ct. at 2969. Those

AO 72
(Rev.8/82)

59

statutes, however, did not provide substantive claims; thus, plaintiffs would have to point elsewhere for a remedy. The allottees asserted that several statutes and regulations, read together, created a fiduciary obligation on the part of the United States, the breach of which would subject to United States to liability for damages. The Supreme Court was then put to task to establish a test to determine when a statute imposed such an obligation on the United States. The Court placed the burden on the claimant to "demonstrate that the source of substantive law... relie[d] upon 'can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained.'" 103 S.Ct. at 2968, quoting Eastpart S.S. Corp. v. United States, 178 Ct.Cl. 599, 607, 372 F.2d 1002, 1009 (1967).

Applying this test, the Supreme Court found that the laws and regulations set forth by the allottees "establish comprehensive responsibilities of the Federal Government" with regard to the management of the Indians resources. 103 S.Ct. at 2971. These laws, when set against the historic nature of the trust relationship between the United States and the Indian people

> clearly establish fiduciary obligations of the Government in the management and operation of Indian lands and resources [and] they can fairly be interpreted as mandating compensation by the Federal Government for damages sustained. Given the existence of a trust relationship, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties.

103 S.Ct. at 2972-2973. In conclusion, the Supreme Court noted that "[t]his Court and several other federal courts have consistently recognized that the existence of a trust relationship between the United States and an Indian or Indian tribe includes as a fundamental incident the right of an injured beneficiary to sue the trustee for damages resulting from a breach of the trust." 103 S.Ct. at 2973.

The underlying rationale of Mitchell II is of significant guidance here. The Court must determine whether the plaintiffs have demonstrated that the Trusteeship Agreement clearly establishes fiduciary obligations of the United States with respect to the administration of the Trust Territory and if so whether the Agreement can "fairly be interpreted as mandating compensation by the Federal Government for damages sustained" by a breach of these obligations. The Court finds these questions readily answered in the affirmative.

The fiduciary nature of the Trusteeship is well recognized. This Court has previously held that "[t]he relationship between the United States and the Trust Territory's people is 'a fiduciary one... [in which] the interests of the inhabitants of the territory become paramount." Temengil I at 10 (quoting Liebowitz, The Marianas Covenant Negotiations, 4 Fordham Int'l. L.J. 19, 79 n.236 (1980)), 42-43, 56, and notes 17 and 107. The appellate division of this Court has concurred. Palacios v. Commonwealth of the Northern Mariana Islands, supra p.22, at 14 ("we find that the TTPI stands in a fiduciary relationship as

AO 72
(Rev.8/82)

trustee to the peoples of the Trust Territory"). See also Juda v. United States, No.172-81L (Ct.Cl. Memorandum Decision filed Oct. 5, 1984) at 23-24 (the sovereignty of the Trust Territory is held in trust for the inhabitants by the United States). Moreover, the Trust Territory itself has conceded its trusteeship status in relation to the Micronesian people. See Temengil I at 42.

The Trusteeship Agreement is clear regarding the duties and obligations of the United States toward the people of the islands of Micronesia; this is especially so regarding the covenants against discrimination. The granted powers of administration are subject to the provisions of the agreement. Art.4. Article 6(3) is direct in its command that the United States "shall protect the rights and fundamental freedoms of all elements of the population without discrimination.". (Emphasis added). Furthermore, the United States, under Article 4, is bound to act in accordance with the Charter of the United Nations in which are contained additional references regarding the fundamental right to be free from race or national origin oriented discrimination. See, e.g., Charter of the United Nations, Art. 1(3)(purposes of United Nations include "encouraging respect for human rights and for fundamental freedoms for all without distinction as to race"); Charter, Articles 55 and 56 (all nations pledge themselves to take action for the achievement of universal respect for, and observance of, human rights and fundamental freedoms for all without distinction as to race). See generally

AO 72
(Rev.8/82)

L. Goodrich, E. Hambro and P. Simons, Charter of the United Nations, Commentary and Documents at 377-382 (1969).

This Court, as well as other federal courts have recognized the clarity, specificity and enforceability of the obligations imposed under the Trusteeship Agreement. In the earlier decision in this case, this Court characterized the rights created by the Agreement as "unprecedented among trusteeship agreements in their detail, precision and scope." Temengil I at 14. The Ninth Circuit has also had an opportunity to discuss the obligations of the Agreement. In People of Saipan v. Department of the Interior, supra p.8, the panel considered assertions that the Agreement created substantive, enforceable rights. The opinion stated that the answer to the question must be determined by reference to many contextual factors including the purpose of the treaty, the existence of domestic institutions appropriate for direct implementation, the availability of alternative forums and the immediate and long-range consequences of self-execution. After a thorough review of these factors, the court concluded that "[t]he preponderance of features in this Trusteeship Agreement suggests the intention to establish direct, affirmative, and judicially enforceable rights." 502 F.2d at 97. The Trusteeship Agreement creates for the islanders "substantive rights that are judicially enforceable." 502 F.2d at 96.

In reaching this conclusion, the Ninth Circuit agreed that while the rights may not be "precisely defined", they are not "too vague for judicial enforcement." 502 F.2d 99. The

AO 72
(Rev.8/82)

63

missing terms and definitions can come from the "relevant principles of international law... which have achieved a substantial degree of codification and consensus." Id. A well-recognized and leading document of such principles is the Universal Declaration of Human Rights, Gen.Assembly Res. 217 A(III)(Dec. 10, 1948). Filartiga v. Pena-Irala, 630 F.2d 876, 882 (2nd Cir. 1980). See also Nguyen Da Yen v. Kissinger, 528 F.2d 1194, 1201 n.13 (9th Cir. 1975)(Declaration is evidence of "law of nations"); Fernandez v. Wilkinson, 505 F.Supp. 787, 796 (D.Kan. 1980) aff'd, 654 F.2d 1382 (10th Cir. 1981)(international law is exemplified by Universal Declaration). The Declaration was passed by a vote of 48-0 with only eight abstentions. Goodrich, Hambro and Simons at 377. The Declaration, the Preamble of which expressly applies the stated principles to trust territories, was adopted by the United States in 1948, within a year of the commencement of the Trusteeship Agreement. Human Rights Documents, Committee on Foreign Relations, U.S. House of Representatives (Sept. 1983). The Declaration is clear regarding equal protection and freedom from discrimination on the job.

Article 2 provides:

> Everyone is entitled to all the rights and freedoms set forth in this Declaration, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status.

Article 7 reads:

> All are equal before the law
> and are entitled without any dis-
> crimination to equal protection of
> the law. All are entitled to equal
> protection against any discrimina-
> tion in violation of this Declara-
> tion and against any incitement to
> such discrimination.

Article 23(2) provides elaboration regarding equality in employ-ment:

> Everyone, without any dis-
> crimination, has the right to equal
> pay for equal work.

The Court is of the opinion that the Trusteeship Agreement and the relationship it created meet the test set forth in _Mitchell II_. The Agreement establishes a fiduciary relation-ship in which the duties and obligations of the United States are clear, especially with respect to the rights of the islanders to be free from discrimination.[4/] These rights are enforceable in domestic courts of law. As this Court wrote in its previous de-cision, Micronesia "is a U.S. Trust Territory, and if the United States has fulfilled its trust to the inhabitants badly, then those responsible for this condition ought to also be responsible for its remedy." _Temengil I_ at 43, quoting S.Rep.No. 223, 90th Cong. 1st Sess. 8 (1967).

---

[4/] The absence of an express enforcement scheme is not determina-tive. "[T]he substantive source of law may grant the claimant a right to recover damages either 'expressly or by implica-tion.'" _Mitchell II_, 103 S.Ct. 2968 n.16, quoting Eastport S.S.Corp. v. United States, 178 S.Ct.Cl. 599, 605, 372 F.2d 1002, 1007 (1967).

AO 72
(Rev.8/82)

The Court concludes, and sets forth as an alternative holding, that the Trusteeship Agreement imposes upon the United States fiduciary obligations and subjects the United States to monetary liability for the damages resulting from the breach of those duties. Thus, plaintiffs claims for monetary damages relief against the Trust Territory are not barred.

## II.  PUNITIVE DAMAGES

### A. Trust Territory Government

The Trust Territory also moves to strike the demand for punitive damages raised in the complaint in intervention. As a general matter, punitive damages may be assessed against individuals in actions brought under § 1981 and § 1983. Johnson v. Railway Express Agency Inc., 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); Smith v. Wade, ___ U.S. ___, 103 S.Ct. 1625, ___ L.Ed.2d ___ (1983). In 1977, the Supreme Court opened the courthouse door to § 1983 actions against municipal corporations by finding such defendants suable "persons" within the meaning of the statute. Whether punitive damages could be assessed against municipalities remained an open question.

In City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), the Supreme Court reversed a decision of the First Circuit which had allowed a punitive damage award against the defendant city to stand. Applying the two-part test set forth in Owen v. City of Indepen-

AO 72
(Rev.8/82)

dence, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), the Court first examined the history of punitive damage immunity at common law and under § 1983. The Court found it "not open to serious question", that "municipality immunity was well established at common law"; the Court unearthed "no evidence that Congress intended to disturb the settled common law immunity." 101 S.Ct. at 2756, 2759. The inquiry did not end here, however, for as the Civil Rights Act of 1871 "was designed to expose state and local officials to a new form of liability, it would defeat the promise of the statute to recognize any pre-existing immunity without determining both the policies that it serves and its compatibility with the purposes of § 1983." 101 S.Ct. at 2755. Thus, the Court examined the objectives underlying punitive damages and their relationship with the goals of § 1983.

The Court found the two underlying purposes of punitive damages to be punishment and deterrence. Regarding punishment, the Court concluded that imposing punitive damages against a municipality would not significantly further the retributive purposes. First, the punishment does not fall on the wrongdoer, but on "blameless or unknowing" taxpayers who will likely suffer "an increase in taxes or a reduction in public services...for footing the bill." 101 S.Ct. at 2760. Also, the Court noted that a municipal government can have no malice independent of the malice of its officers and agents, and therefore it is the officer who acts knowingly and maliciously who is the "appropriate object of the community's vindictive sentiments." Id. Thus, damages

AO 72
(Rev.8/82)

67

imposed for punishment "are not sensibly assessed against the governmental entity itself." Id. Moreover, the underlying principles of § 1983 did not alter the Court's analysis, for the Court "never has suggested that punishment is as prominent a purpose under the statute as are compensation and deterrence." Id. Continuing on to discuss deterrence, the Court did not find the imposition of punitive damages on municipalities to significantly further the goal of preventing future misconduct. Not only would the threat of large damage awards against the city not likely deter wrongful conduct of the officials, but in the majority's opinion, a finding of malicious conduct would set the political process in motion expelling the wrongdoer from the government ranks. 101 S.Ct. at 2761. Also, the assessment of punitives against the responsible official is a more effective means of deterrence. Lastly, the majority concluded that the potential threats posed to the fiscal integrity of municipal governments outweighed the benefits, which were of "doubtful character", of assessing punitive damages against cities. Id. In sum, the Court found that considerations of history and policy dictated that municipalities be immune from punitive damages under 42 U.S.C. § 1983.

[20] The Trust Territory urges the application of City of Newport to the case at bar. Although the holding of that case is limited to municipalities, the underlying rationale would apply to all "bodies politic" subject to liability under § 1983. In fact, the Supreme Court even discussed the potential serious

68

impact of punitive liability on municipalities "and other units of state and local government." 101 S.Ct. at 2761. The concerns expressed by the Court regarding the punitive effect on the blameless citizenry, the questionable deterrence value and the threat to the financial integrity of government bodies are applicable as well to the Trust Territory. Thus, although this Court finds appeal in the suggestion by the dissent that while a body politic should not be liable for punitive damages as _respondeat superior_, punitive liability is not so unreasonable when the unconstitutional and malicious acts were part of established official policy, the Court is bound by the majority's decision. The Trust Territory's motion to strike is granted.[5]

---

[5] The immunity from punitive damage liability is not an immunity of which the Trust Territory is stripped in the court of another sovereign under _Nevada v. Hall_. Common law government tort immunities developed separately in the field of torts and within the doctrine of sovereign immunity. See _Owen v. City of Independence_, 100 S.Ct. at 1410-1415. Under _Nevada_, it is only those immunities attributable to sovereignty that need not be recognized in another sovereign's courts. As the punitive damage immunity appears to have developed as a matter of public policy within the law of torts, it may still be asserted by the Trust Territory here. See, e.g., D. Dobbs, _Law of Remedies_ at 217-218 (1973); E. McQuillan, 18 _The Law of Municipal Corporations_ § 53.18a (3rd Ed., 1984 rev.vol.). See also, e.g., Annot., _Recovery of Exemplary or Punitive Damages from Municipal Corporation_, 1 ALR 4th 448 (1930).

AO 72
(Rev.8/82)

## B. High Commissioner

The complaint in intervention raised for the first time a demand for punitive damages against the High Commissioner.[6] As noted above, it is well established that punitive damages may be awarded against individual government officials. Smith v. Wade, supra p.30. However, there has been confusion in this case as to whether the High Commissioner was sued in his/her[7] individual or official capacity or both. In its earlier decision in this case, the Court noted this confusion and concluded that "the plaintiffs sue the defendant officers only in their official capacities." Temengil I at note 5. The complaint in intervention adopts the defendant allegations as pleaded in the amended complaint; no new allegations as to individual capacity are added. Thus, the Court adheres to its earlier conclusion that the defendant High Commissioners are before this Court in their official capacities only. Should the plaintiffs desire to seek punitive damages against the High Commissioners individually, they must so allege and must satisfy venue and process service requirements.

---

[6] Although the complaint does not specifically state that punitive damages are sought against the High Commissioner individually, plaintiffs Memo in Opposition makes it clear that the intent is to hold the High Commissioner "personally liable." Memo in Opposition to TTPI's Motion at 12.

[7] On Jan. 16, 1981, when the initial complaint was filed, it named then High Commissioner Adrian Winkel. On March 22, 1983, pursuant to Federal Rule of Civil Procedure 25(d)(1) the Court substituted High Commissioner Janet McCoy in place of the original defendant. Thus, when referring to the High Commissioner in this section, the Court will use the his/her pronoun.

AO 72
(Rev.8/82)

70

## III. JURY TRIAL

The complaint in intervention raises also for the first time a demand for a jury trial. Plaintiffs amended complaint prayed for declaratory and injunctive relief and for an award of back pay; no other damages were sought. Thus, the class was certified by this Court under (b)(2) of Federal Rule of Civil Procedure 23. In Williams v. Owens-Illinois, Inc., 665 F.2d 918, (9th Cir. 198?), cert. denied 459 U.S. 971, 103 S.Ct. 302, 74 L.Ed.2d 283 (1982), the Ninth Circuit squarely addressed the availability of a jury trial as to such issues:

> [T]he only requested remedy other than injunctive relief which was before the court was back pay. That relief, however, was properly viewed as either equitable or as a legal remedy incidental to an equitable cause of action [footnote omitted] and accordingly not sufficient to create a right to jury trial.

665 F.2d at 929. Remedies which are legal in nature but are incidental to equitable claims do not entitle a party to a jury trial. Id. at note 10, citing Beacon Theatre, Inc. v. Westover, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959). By the terms of Williams, the Court must deny the plaintiffs' jury demands and grants the Trust Territory's motion to strike.

///
///
///
///

AO 72
(Rev.8/82)

## IV. CONCLUSION

For the reasons stated above, the Court denies the Trust Territory's motion to dismiss and grants the motions to strike the demand for jury trial and to strike the claim for punitive damages.

Feb. 4, 1985
_____
Date

_____
JUDGE ALFRED LAURETA

AO 72
(Rev. 8/82)